## AT & T COMMUNICATIONS OF THE SOUTHWEST, INC., Appellant,

v.

## PUBLIC UTILITY COMMISSION OF TEXAS, Southwestern Bell Telephone Company, and GTE Southwest Incorporated, Appellees.

No. 03–94–00113–CV.

Court of Appeals of Texas, Austin.

Aug. 30, 1995.

Rehearing Overruled Oct. 11, 1995.

---

Joseph Latting, Liddell, Sapp, Zivley, Hill & Laboon, Austin, for AT & T.

Dan Morales, Attorney General, Liz Bills, Assistant Attorney General, Austin, for Public Utility Commission.

Anthony P. Gillman, Austin, for GTE.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for Southwestern Bell.

Before CARROLL, C.J., and POWERS and B.A. SMITH, JJ.

POWERS, Justice.

AT & T Communications of the Southwest, Inc. (AT & T) sued the Public Utility Commission for judicial review of a final order issued by the Commission in a contested case.[1] Southwestern Bell Telephone Company (SWB) and GTE Southwest Incorporated (GTE) intervened in the district-court suit to defend the Commission order. AT & T appeals from the district-court judgment affirming the order. We will affirm the district-court judgment.

## THE CONTROVERSY

AT & T, SWB, and GTE submitted competing bids for the contract right to provide the State of Texas long-distance telephone service—the "TEXAN II" network—for a five-year period. In arriving at its bid, AT & T calculated its projected costs on an assumption that it would obtain Private Branch Exchange (PBX) trunk-line rates from SWB and GTE, the local-exchange carriers for the TEXAN II area.[2] AT & T won the contract, underbidding SWB and GTE by about sixteen million dollars.

In the course of implementing the network, AT & T ordered PBX trunk lines from SWB and GTE as described in their local and general-exchange tariffs. SWB and GTE declined to provide the trunk line at a PBX-surcharge rate on the ground that the AT & T equipment did not qualify for that rate. They insisted that AT & T must pay instead the higher access-charge rate established in their tariffs under the heading "Feature Group A." To resolve the dispute, AT & T initiated in the Commission a contested-case proceeding to obtain the following relief: (1) declaratory relief that the interpretation given their tariffs by SWB and GTE was unjust, unreasonable, and unlawful; (2) an agency order directing that SWB and GTE provide AT & T the trunk-line services at the PBX surcharge rate listed under their general and local exchange tariffs; and (3) an agency order directing that SWB and GTE bill the State of Texas or AT & T as the State's agent for the PBX rates fixed in the general and local tariffs of SWB and GTE. The Commission denied the requested relief. On judicial review, the district court affirmed the Commission order. AT & T appeals on three points of error.

## TARIFF INTERPRETATION

AT & T disputes in its first point of error the Commission's interpretation of GTE's and SWB's tariffs and the resulting agency decision that the tariffs required that AT & T pay the higher access-charge rate for "Feature Group A" rather than the lower PBX-surcharge rates.[3]

1. *See* Tex.Public Utils.Comm'n, *Petition for Declaratory Judgment and Relief of AT & T Communications of the Southwest, Inc. Against Southwestern Bell Telephone Company,* Docket No. 8395, 17 Tex.P.U.C.Bull. 1973 (Dec. 6, 1994).

2. Pursuant to the divestiture ordered in *United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1982), *modified, United States v. Western Electric Co.,* 714 F.Supp. 1 (D.D.C.1988), the court divided the United States into geographic areas denominated "Local Access and Transport Areas" (LATAs) or exchange areas. Under the order, AT & T may provide only inter-exchange long-distance service while SWB and GTE provide only local-exchange long-distance telephone service in their

respective geographical areas. These limitations gave rise to the necessity that AT & T purchase local-exchange service from SWB and GTE in order to complete the TEXAN II network.

3. The Commission's interpretation of a utility's tariff provisions would ordinarily be entitled to a good deal of judicial deference simply because of the agency's experience and expertise in tariff administration and its statutory responsibilities for all aspects of utility regulation, including the duty of assuring rates that are fair, just, reasonable, and free from undue discrimination. *See Calvert v. Kadane,* 427 S.W.2d 605, 608 (Tex. 1968); *Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944). *See generally* 2 Am. Jur.2d *Technical Matters* § 523 (1944). AT & T contends, however, that the Commission's inter-

*Local Exchange Access Charges and the "Leaky PBX" Factor.*

Both local telephone calls and long-distance calls originate and terminate over PBX trunk lines. When a long-distance call is made, the call travels from the caller's telephone to a local-exchange carrier's office. There the call is directed to the inter-exchange carrier's portion of the network, or that carrier's "point of presence." Inter-exchange carriers compensate local-exchange carriers, by access charges based on usage, for use of the latter's portion of the network. PBX systems provide "pooled" access to the local carrier's line, thereby reducing the number of trunk lines required by the customer and thus the customer's expense. Many PBX systems have the capacity to "leak" incoming long-distance calls into the local network; in such instances, the "leaked" long-distance calls are indistinguishable from purely local calls. For example, a PBX-system customer having offices in several Texas cities may place a long-distance call from its Dallas office to its Austin office, and the call may be "leaked" or transferred to another off-network location within Austin. The call will register as a local call in Austin even though it connects a caller in Dallas to a recipient in Austin. Because such "leaks" *appear* to be purely local calls, local-exchange carriers lose the associated access charges. To compensate local carriers for the resulting loss of income, the Federal Communications Commission ("FCC") instituted a flat rate of twenty-five dollars per month to be assessed generally against all PBXs capable of such "leaks." [4]

AT & T installed a digital switching device, known as a "5ESS," in the Sam Houston State Office Building in Austin and sixteen "System 75s" throughout the State as part of the Tex–An II network. Calls are first routed to the 5ESS in Austin and then switched to the appropriate System 75. These System 75s, developed by AT & T for use in the Tex–An II network, are similar to PBX systems

pretation of the tariff provisions is entitled to little or no judicial deference—construction of the applicable words and phrases involves only a question of law and a reviewing court is fully competent to perform that task as in the case of any document requiring interpretation. The matter is, in our view, not that simple.

"A tariff is not an abstraction. . . . Complex and technical cost-allocation and accounting problems must be solved in setting the tariff initially. . . . It therefore follows that the decision whether a certain item was intended to be covered by the tariff . . . involves an intimate knowledge" of the reasons why the tariff was established as it was in the first instance. *United States v. Western Pac. R.R.*, 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956). In some cases, it may be true that a reviewing court is competent to construe tariff language based merely on common usage. On the other hand, the tariff language may involve words or phrases that are "technical" or "not commonly understood"; or the words and phrases may have a regulatory impact not understood or appreciated by the ordinary reader. *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 771 (Tex. App.—Dallas 1992, no writ). The distinction always depends "on the particular facts of each case." *Western Pac. R.R.*, 352 U.S. at 69, 77 S.Ct. at 168. And a reviewing court must understand that the *facts* of the case may bear on the meaning proper to be assigned the tariff language. In that connection, due respect must be given the agency's orchestration of the tariff language and the facts the agency has found from the evidence in the particular case. *Id.* at 64–65, 77 S.Ct. at 165–66. On the other hand, there may be no antecedent agency fact findings, the facts may, indeed, be stipulated, and the material tariff provisions may be susceptible of judicial interpretation based merely upon common usage. *See, e.g., United States v. Missouri Pac. R.R.*, 250 F.2d 805, 807 (5th Cir.), *cert. denied*, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958).

In the present controversy, the tariff language is not susceptible to an interpretation based merely upon ordinary usage; technical words and phrases are laden with regulatory impact and the facts found by the Commission bear importantly upon which tariff provisions apply in the case. We conclude, therefore, that the Commission's construction of the tariff provisions is entitled to commensurate respect and deference on our part.

4. The FCC calculated the $25 monthly surcharge by estimating that eighty percent of all lines were capable of leakage and that only eight percent of all communications made over these lines were interstate. The FCC then determined that 6.4 percent of all private-line usage "leaked" into the local exchange (eight percent of eighty percent equals 6.4 percent). Estimating that local-exchange carriers were losing approximately four hundred dollars monthly, the FCC calculated that the "leaky" surcharge should be twenty-five to thirty-two dollars per month (6.4 percent of $400–$500). *See In the Matter of MTS & WATS Mkt. Structure*, 97 F.C.C.2d 718, 720 (1983) (pet. for reconsideration).

but are not capable of originating local calls.[5] However, state employees may place local calls by using PBX systems incorporated in the Tex–An II network. Moreover, the System 75s are used *solely* to switch long-distance on-network calls off the network and onto a local line so that the call appears to be a local call, thus bypassing the local-exchange carrier's access charge. The terms of the Tex–An II contract estimate that approximately seventy-six percent of the on-network calls to off-network calls would be routed over non-usage-sensitive facilities in order to avoid inter-exchange access charges. In fact, each and every on-network call destined for an off-network location avoids the access charge.

*The Commission's Interpretation of the Tariffs.*

■■■ SWB's and GTE's tariffs are divided into several sections headed by descriptive titles. The present dispute involves only SWB's and GTE's "General Exchange," "Local Exchange," and "Access Service" tariffs.[6] It is undisputed, of course, that SWB and GTE must abide by the tariffs.[7] *See* Public

---

**5.** The parties concede that the System 75 set up in Potter County, Texas is capable of originating local calls and is functioning as a PBX system. Therefore, the Potter County system is not at issue and is not included in our discussion of System 75s.

**6.** Pertinent portions of the tariffs relied on by the parties provide as follows:
SWB'S GENERAL EXCHANGE TARIFF:
1.6 *Local Exchange Access Line Charges*
1.6 Application of Business Local Exchange Access Line Charges:
(A) The PBX trunk or Hotel rate applies for use in providing access to communication systems which perform switching functions and/or connect with the local exchange access lines on a pooled access basis.
SWB'S ACCESS SERVICE TARIFF:
1. *Application of Tariff*
1.1 This tariff contains regulations, rates and charges applicable to the provision of Carrier Common Line, End User Access, Switched Access, and Special Access services, and other miscellaneous services....
....
6. *Switched Access Service*
6.1 *General*
Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point electrical communications path between a customer's premises and an end user's premises. It provides for the use of common terminating, switching and trunking facilities, and common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer's premises, and to terminate calls from a customer's premises to an end user's premises in the [Local Access and Transport Area] where it is provided.
....
6.2.1 *Feature Group A (FGA)*
(A) *Description*
(1) FGA is provided in connection with Telephone Company electronic and electromechanical end offices. At the option of the customer, FGA is provided on a single or multiple line group basis and is arranged for

originating calling only, terminating calling only, or two-way calling....
....
7.4.2 *Surcharge for Special Access Service*
(A) *General Description*
The Special Access Surcharge applies to all jurisdictionally intrastate *special access* facilities ordered from the Special Access section of the Access Service Tariff unless exempted as specified in (B) following.
All such facilities terminated at an end user's *PBX or other device* that connect the special access facility with local exchange lines or trunks, irrespective of whether the interconnection capability exists in the customer's premises equipment or in a Centrex Co type switch are subject to the surcharge.
(Emphasis added.)
GTE'S GENERAL EXCHANGE TARIFF:
*Private Branch Exchange (PBX/PABX):*
A communication system consisting of *various stations*, equipment and facilities to connect these stations to central office lines of [sic] to other stations in the system either manually or automatically.
....
*Definition of Terms*
*Switched System:* A Private Branch Exchange [GTE's special access surcharge provisions are substantially similar to SWB's access surcharge and exemptions.]
(Emphasis added.)

**7.** The Commission is empowered to "fix and regulate rates of public utilities, including rules and regulations for determining the classification of customers and services and for determining the applicability of rates." Public Utility Regulatory Act of 1995 (PURA), 74th Leg., R.S., ch. 9, §§ 3, 4, 1995 Tex.Sess.Law Serv. 31, 87–88 (West). In ratemaking proceedings, the burden of proof as to rate and service classifications rests upon the utility. *See id.* § 10. Once the Commission approves a utility's tariffs, the utility may not charge a higher rate than provided in its tariffs. *See id.* §§ 31, 32. The approved tariffs govern a utility's relationship with its customers and have the force and effect of law. *Southwestern Bell Tel. Co. v. Vollmer,* 805 S.W.2d 825, 828–

Utility Regulatory Act of 1995 (PURA), 74th Leg., R.S., ch. 9, §§ 3, 4, 1995 Tex.Sess.Law Serv. 31, 87–88 (West); PURA §§ 31, 32; 16 Tex.Admin.Code § 23.24(a) (West 1988).

■ Construing the tariff provisions as a whole, the Commission determined that the Feature Group A access tariff applied. It is implicit in the Commission's findings of fact and conclusions of law that AT & T would have qualified for the lesser "leaky" PBX surcharge if, in fact, AT & T's System 75s functioned as PBX systems. AT & T does not challenge the Commission's findings that the System 75s were connected to one or no station lines and were not used to access the local network—findings that negated the defining functions of a PBX system (findings of fact 33(a), (c), and (d)). Nor does AT & T challenge the Commission's finding that PBX systems that processed local calls *were* present in the locations where System 75s were placed (finding of fact number 33(e)). AT &

T does challenge the Commission's "findings of fact" (conclusions of law, really) numbered 35, 48, and 50. They are as follows:

35. GTE and SWB tariffs are permissive rather than prohibitive and one must look beyond the local and general tariffs to the access tariffs to find the tariff applicable to the local termination of an on-network to off-network long distance network call.[8]

48. Although SWB's and GTE's local and general exchange tariffs do not expressly state that AT & T cannot terminate interexchange traffic over PBX trunks, all applicable tariff provisions read together clearly indicate that prohibition.

50. The use of the facility determines which tariff applies.[9]

AT & T argues as follows: (1) AT & T relied upon SWB's and GTE's local or general exchange tariffs, which do not specifically

29 (Tex.App.—Corpus Christi 1991, writ denied); *Southwestern Bell Tel. Co. v. Rucker*, 537 S.W.2d 326, 331 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.).

A reasonable classification of customers and services, in the utility's tariffs filed with the Commission, is essential to prevent undue discrimination and unreasonable rates. The central idea in classifying customers and services is that there must be a genuine rationale for any disparate treatment among customers who are similarly situated: reasonableness of the classifications, in terms of the service involved, is the major criterion. A not unreasonable "yardstick" for measuring reasonableness is the substantial similarity of "billing factors." *Ford v. Rio Grande Valley Gas Co.*, 141 Tex. 525, 174 S.W.2d 479, 480 (1943). *"Any* matter which presents a substantial difference as a ground for distinction between customers, such as quantity used, time of use, or manner of service, *is* a material billing factor." *Id.* (emphasis added); *see also Texas & N.O. R.R. v. Texas R.R. Comm'n*, 155 Tex. 323, 286 S.W.2d 112, 121–22 (1955). *See generally* 1 A.G.J. Priest, *Principles of Public Utility Regulation* 295–307, 340–45 (1969). The burden of proving unlawful discrimination, resulting from tariff classifications of customers and services, rests upon the party asserting the claim. *Rio Grande Valley Gas Co.*, 174 S.W.2d at 481–82.

8. GTE disputes that its tariffs do not prohibit the application of the local-exchange tariff, pointing to its General Exchange tariff section entitled "Use of Intraexchange Private Line Channels." It asserts that AT & T may use PBX trunks for administrative purposes; however, it may not utilize PBX trunks to provide dedicated interex-

change service. That portion of GTE's tariff provides:

> Services provided under this tariff shall be used by private line customers for use in obtaining end-to-end private line services. Interexchange Carriers may use services found in this tariff that will meet their administrative needs; *however, an Interexchange Carrier is restricted from utilizing services found in this tariff to furnish a portion of their authorized service offerings.*

(Emphasis added.)

SWB and the Commission argue that tariffs, by their nature, are permissive rather than prohibitive and that when there are affirmative provisions in an appropriate tariff that specifically address a particular situation, prohibitions throughout other tariffs are irrational, duplicative, and unnecessary.

9. Other findings of fact and conclusions of law that focus on the use of the equipment are as follows: (1) "A leaky PBX surcharge is not applicable to the disputed facilities because a leaky PBX can exist only if a PBX exists, and in this case the System 75s are neither PBXs nor functioning as PBXs." (finding of fact number 40); (2) "The use of a telecommunications facility and not its label is the determining factor in rate application." (finding of fact number 41); (3) "In construing tariffs in a manner consistent with the public interest, the Commission is bound to consider the use of the service." (conclusion of law number 7); and (4) "The $25 per month leaky PBX surcharge does not apply to the disputed facilities, because neither the 5ESS nor the System 75s function as PBXs." (conclusion of law number 11).

prohibit AT & T's intended use for the PBX trunk lines when bidding on the State contract; (2) SWB's and GTE's local and general tariffs (and their included surcharge for "leaky" PBXs) are therefore the proper tariff charge; (3) even if the Access tariffs apply, AT & T should only be charged for the "leaky" PBX surcharge also found in the Access tariffs; (4) the Commission unduly discriminated against AT & T by subjecting it to restrictions not stated in the tariffs; (5) the Commission's construction of the tariffs has destroyed their predictability and will discourage other companies from developing new cost-efficient networks in the future; and (6) there is no such thing as a "wrong" tariff and AT & T may select the service it desires from any of a utility's tariffs in the absence of a rule prohibiting such selection.

SWB and GTE rejoin that in cases involving tariff interpretation, one must look to the intended use [10] of the equipment to determine which tariff properly applies as opposed to the mere name or label assigned the equipment. In order to qualify for the lesser surcharge for "leaky" PBX equipment, they say, the equipment must be a "true" PBX, that is to say, the equipment must amount to a switching device located on the customer's premises and consist of multiple individual telephone instruments on lines that are connected to a central office line. And because the System 75s are not connected to individual telephones within the State network but are used only to terminate on-network calls on the local system, the System 75s do not qualify as a "PBX or other switching device." Moreover, SWB and GTE contend, their local and general tariffs do not prohibit AT & T's intended use for the trunk lines; the Access tariffs implicitly permit their use, albeit at a greater charge.

*Classification by Equipment Use.*

The Commission, by classifying the System 75s by their use (findings number 48 and 50), conformed to the agency's previously estab-

lished rules. *See* 16 Tex.Admin.Code § 23.3 (1994); [11] *see also Central Tex. Iron Works, Inc. v. Red Arrow Freight Lines, Inc.,* 440 S.W.2d 674, 676 (Tex.Civ.App.—Dallas 1959, writ dism'd) (nature and use of property determines which tariff applies); *Associated Press v. Federal Communications Comm'n,* 452 F.2d 1290, 1296 (D.C.Cir.1971) (headings in tariff provisions do not fix scope of tariff operation, but they do identify rates applicable to *particular type of usage* and distinguish that type from others; and provisions under specific tariff designation prevail over those included under more general heading). We also note that the Federal Communications Commission (FCC) focuses on the function of particular equipment to determine which of several tariffs applies in a particular case. For example, the FCC determined that when a "Centrex–ETS" combined the functions of a Common Controlled Switching Arrangement ("CCSA") with a PBX-like switching device, customers were obliged to pay the Feature Group A access charge fixed for CCSAs because Centrex–ETSs competed directly with CCSAs. *In the Matter of Bell Atl. Petition for Declaratory Ruling Concerning Application of the Commission's Access Charge Rules to Private Telecommunications Sys.,* 2 F.C.C.Rcd. No. 25, 7458 ("FCC Docket 87–361"). Stated another way, the FCC determined that because the Centrex–ETS performed the same function as a CCSA, the customers of Centrex–ETS were not permitted the lower rates merely because the Centrex–ETS also performed the functions of a PBX. The use or function of the equipment was the determining factor even though the tariffs did not expressly prohibit charging the PBX rate.

*Construing the Tariffs as a Whole.*

■ The Commission followed a familiar rule of document interpretation by construing together all applicable tariff provisions (finding number 48). We believe the tariffs are not rendered unpredictable as a result.

---

10. The Commission repeatedly found that the use of the equipment controlled which tariff applied. *See supra* note 9 and accompanying text; *see also supra* note 7.

11. The Commission's substantive rules define a "[c]lass of service or customer class" as "[a]

description of utility service provided to a customer which denotes such characteristics as *nature of use or type of rate.*" 16 Tex.Admin.Code § 23.3 (emphasis added). Tariffs must be "stated separately by *type or kind of service* and the customer class." *Id.* (emphasis added).

We believe it unreasonable, on the other hand, to extract the words "PBX or other switching device" from their tariff context and to seek to apply them standing alone, which appears to be the sense of AT & T's argument. And assuming for purposes of discussion that the local and general exchange tariffs do apply to the systematic termination of long-distance traffic, it is well established that whenever two rate classifications appear to be equally applicable, that which specifically includes the requested service will control to the exclusion of the general tariff. *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 770 (Tex. App.—Dallas 1992, no writ); *see also United States v. Gulf Ref. Co.*, 268 U.S. 542, 546, 45 S.Ct. 597, 599, 69 L.Ed. 1082 (1925). System 75s are used exclusively to terminate long-distance calls. We therefore find unpersuasive AT & T's argument that the Commission was unreasonable in its conclusion that *local* tariffs apply to *local* calls while switched-access tariffs apply to inter-exchange calls that are switched onto a local network.

*The Commission's Determination that the PBX Surcharge Applied Solely to Incidental "Leakage."*

The Commission also concluded that access charges ordinarily apply to a system that switches long-distance network calls to a local line unless no means existed for determining that a long-distance call was switched (finding number 24), and that a relatively small "leaky" PBX surcharge ($25 per month) was implemented by the FCC because "leakage" was considered to be only incidental (finding number 29). In recognizing the existence of a significant problem with the surcharge, the FCC determined that it was nevertheless the best alternative available to compensate local-exchange carriers. *See In the Matter of Amendment of Part 69 of the Commission's Rules Relating to Private Networks and Private Line Users of the Local Exchange*, 2 F.C.C.Rcd. No. 25, 7441 ("FCC Docket 87–530"). The small, almost nominal, surcharge promulgated by the FCC was intended to be a temporary solution until technological advances allowed a superior method for calculating the charge through "actual measurement or otherwise." *Id.*

We believe the Commission could reasonably infer from the FCC's estimate of "leakage" that the FCC surcharge was intended to apply only to *incidental* leakage and was not intended to apply to a PBX system or other device that "leaks" one-hundred percent of its calls. We note, for example, the FCC also determined as follows:

> [W]hile PBX switches could, and no doubt in many cases did, leak interstate traffic into the local exchange, they also switch substantial amounts of local traffic. Indeed, it appeared that, in most cases, *local calling rather than interstate leakage was the predominant use of local exchange lines connected to PBX switches.*

FCC Docket 87–530, at 7441 (emphasis added). As stated above, "leaky" PBX surcharges were intended to apply where it was impossible for local-exchange carriers to detect which function the PBX was performing. Therefore, when it is undisputed that a System 75 is used *solely* to switch long-distance calls onto the local network, then the Commission could reasonably conclude that the "leakage" is not "incidental" and the resulting surcharge is inadequate.

*Whether the Commission's Interpretation Is Inconsistent with Its Previous Decisions.*

AT & T assails the Commission's finding number 110, which states as follows: "If other inter-exchange carriers follow AT & T's lead, the loss of revenue could be significant and could lead to the imposition of higher local exchange rates. Such a result would adversely affect universal service." AT & T does not dispute the Commission's determination that a significant amount of revenue may be lost if other inter-exchange carriers follow AT & T's lead. Rather, AT & T complains that the proper remedy for any defect in tariffs is to amend them; and by not requiring SWB and GTE to follow that course the Commission acted contrary to its previous decisions in the cases next to be discussed.

AT & T cites the Commission's previous decision in Tex.Public Utils.Comm'n, *Complaint of National Telecommunications of Austin Against Southwestern Bell Telephone*

*Company,* Docket No. 8914, 17 Tex. P.U.C.Bull. 2977 (May 16, 1990) (hereafter "Docket No. 8914"). In Docket No. 8914, the parties agreed that SWB's tariff did not expressly state that a reseller must have a switch in each Local Access and Transport Area (LATA) in order to be classified as a "pure reseller" entitled to certain credits. The Commission determined in that case that tariffs must be clear and specific, and stated as follows:

> Under the PURA and the Commission's rules, if imaginative consumers or technological or regulatory changes create a perceived problem for which a utility's tariff provides no solution, that *presents an issue for resolution by this Commission,* not by the monopoly provider of access service. In such instance, the utility should propose an amendment to its tariff.

*Id.* at 2997 (emphasis added). At issue in the case was the meaning of the expression "pure reseller," which was not defined in SWB's tariffs. The issue in the present appeal is in a sense analogous—what constitutes a "leaky" "PBX or other device" for the purpose of determining which tariff rate applies to AT & T. The present case differs, however, in that portions of SWB's and GTE's tariffs specifically *address* the disputed term. For example, GTE's General Exchange Tariff specifically defines a PBX as a "communication system consisting of various stations, equipment and facilities to connect these stations to central office lines of [sic] to other stations in the system either manually or automatically." It is undisputed that the System 75s were not connected to "various stations." Moreover, the Commission did not depart from its stated policy that tariff provisions must be clear and specific. After considering the words and phrases of the tariff provisions in light of the facts of the case, the Commission simply determined that

the tariff language clearly and explicitly dictated the meaning the agency fixed.[12]

AT & T also refers to the Commission's previous decision in Tex.Public Utils. Comm'n, *Petition of Southwestern Bell Telephone Company for an Order to Show Cause Concerning Disconnection of DIAL 976 Service to Norman Cheney and for Other Relief,* Docket No. 7252, 13 Tex.P.U.C.Bull. 1032 (March 13, 1987) (hereafter "Docket No. 7252"). In Docket No. 7252, SWB applied for a Commission order directing that a subscriber to the utility's DIAL–976 service[13] appear and show cause why SWB should not disconnect the service because of alleged violations of tariff provisions prohibiting "sexually explicit" messages from being delivered to persons under age eighteen. SWB's tariff did not define the term "sexually explicit." Accordingly, SWB requested the Commission to adopt SWB's definition for purposes of the show-cause hearing and for any future controversy. The Commission declined to adopt SWB's suggested definition, concluding that the only means of clarifying the tariff would be a proceeding to amend it. Docket No. 7252, at 1055. The decision in Docket No. 7252 is distinguishable on the ground that the questioned term here *is* defined in the tariff provisions pertaining to switched-access service.

## CONCLUSION

We cannot find that the Commission's conclusions are unreasonable in light of the facts found by the agency from the evidence, the applicable tariff language, the rules of the Commission, or any statutory provision. Accordingly, we overrule AT & T's first point of error.

In AT & T's second and third points of error, the company complains the district court erred in its determinations that AT &

---

12. AT & T refers in its brief to the fact that the Commission created in its final order Project 10756, entitled *Inquiry into the Necessity of Creating a Rule Requiring Local Exchange Telephone Companies to More Clearly Define the Prohibition Against Using Local Exchange Service Tariffs and Leaky PBXs (Special Access Service) Tariffs to Terminate Off–Network Long Distance Traffic.* AT & T argues that because the Commission initiated a study to determine whether the tariffs

required revision, it necessarily follows that revision was needed. We are unable to find the results of Project 10756 in the appellate record.

13. DIAL–976 service consists of SWB routing and transporting calls from the public to entities which provide recorded messages to the public for a charge. Examples of this service include Dial-a-Joke and Dial-a-Santa.

T, rather than the State of Texas, was SWB's and GTE's customer, and that the State was the reseller of network services. It is unnecessary to address these two points of error in light of our disposition of AT & T's first point of error.

For the reasons given, we affirm the district-court judgment.