**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**METRO–LINK TELECOM, INC., Appellee.**

No. 14–93–00987–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 1, 1996.

Rehearing Overruled April 4, 1996.

**688**

Barbara R. Hunt, Dallas, Harry M. Reasoner, Houston, Thomas S. Letherbury, Houston, Mark W. Stevens, Galveston, for appellant.

Kyle L. Dickson, Galveston, Ervin Apffel, Jr., Galveston, Kenneth J. Bower, Galveston, for appellee.

Before YATES, FOWLER and DRAUGHN *, JJ.

* The Honorable Joe L. Draughn sitting by assignment.

## OPINION

FOWLER, Justice.

Metro–Link Telecom, Inc. (Metro–Link) sued Southwestern Bell Telephone Company (Bell) for: (1) attempting to compel Metro–Link to pay higher rates than Bell had initially agreed to charge; (2) for taking away some services Bell agreed to give; and (3) for threatening to take away other services Bell agreed to give Metro–Link. Bell claims among other things that it is immune from suit because it is required to provide services and charge rates in accordance with its tariffs filed with the Public Utilities Commission (PUC), and that the rates and services Metro–Link was using violated its filed tariffs. The case went to trial before a jury who awarded Metro–Link $5 million. Bell brings twenty-eight points of error attacking not only the jury's findings, but also the trial court's refusal to find Bell immune as a matter of law. Metro–Link brings three cross-points complaining about certain rulings of the court.

We reverse the trial court's judgment and render judgment that Metro–Link take nothing in its suit against Bell because we conclude that the filed rate doctrine applies to this case and shields Bell from suit for its actions.

### I. A ROADMAP

This case revolves around a service arrangement between Bell and Metro–Link in which Bell provided products and services to Metro–Link at local rates and Metro–Link used the products and services to provide long distance service to its customers. As noted above, Metro–Link sued because Bell: (1) attempted to make Metro–Link pay the normal rates for long distance service; (2) took some services away from Metro–Link after telling Metro–Link that the services were reserved for local, not long distance, customers; and (3) threatened to take other services away from Metro–Link. At the outset, Bell raises as a defense to the suit a legal doctrine, called the *filed rate doctrine*, which, if applicable, makes Bell immune from suit. Because of its importance, we must discuss at length that doctrine and its applicability.

However, before we can even consider the filed rate doctrine, we must first review and explain: (1) the applicable regulatory background; (2) certain technical terms pertinent to this decision; (3) the nature of the tariff structure in Texas; (4) the configuration of Metro–Link's system; and finally, (5) the differences between local telephone providers and long distance providers and the rates they must pay. This last topic, the differences between local telephone providers and long distance providers, pervades the entire opinion because it provides the basis for understanding why we ultimately conclude that Bell is immune from suit.

### II. TECHNICAL AND REGULATORY BACKGROUND

Bell is a public utility providing local and long distance telephone service. Metro–Link provides long distance telephone service, but not as a public utility. It is a private business. It provides some of its own equipment and then uses Bell's system to provide its customers with service. Metro–Link purchases services directly from Bell and then resells the services to its customers.

As indicated in the preceding paragraph, this case necessarily involves many technical and legal issues unique to the telephone industry and public utilities. In addition, the case turns on events that occurred in the telephone industry nationwide and in Texas in the early 1980s. These events and issues comprise the backdrop for understanding the conclusion that we reach, and ultimately, dictate that conclusion. *See, e.g., United States v. American Telephone & Telegraph,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), *modf'd, United States v. Western Electric Co., Inc.,* 569 F.Supp. 990 (D.C.Cir.1983); *Public Utility Comm'n v. AT & T Communications,* 777 S.W.2d 363 (Tex.1989) ("AT & T Communications").

In 1982, the telephone giant AT & T was found to be a monopoly and ordered to reorganize under the divestiture decree entered in *American Telephone & Telegraph* and *Western Electric.* This reorganization not only split up AT & T's corporate components, but also impacted the provision of telephone

service nationwide. The divestiture drastically changed the landscape of the telephone industry. It divested AT & T of its regional operating companies, which previously were responsible for local telephone service. The divestiture also created 161 distinct geographic areas within the United States. Each of the regional operating companies provide telephone service in these areas called local access transport areas or "LATAs." *See Western Electric*, 569 F.Supp. at 993–95. Each Bell operating company, including Southwestern Bell, is allowed to provide long distance services within a LATA (intraLATA), but not between LATAs (interLATA). As the court in *Western Electric* put it: "Most simply, a LATA marks the boundaries beyond which a Bell Operating Company may not carry telephone calls." *Id.* at 994. Service between LATAs is left to long distance companies unrelated to the Bell operating companies, companies such as AT & T, MCI, and Sprint. *Id.*

The LATA involved in this suit is the Houston LATA, which includes the Houston area (the "713" calling area) and the Galveston–Texas City area (part of the "409" calling area). Although the divestiture decree specifically prohibits Bell operating companies from providing interLATA service, it does not state who could provide long distance service intraLATA. This decision is left to each of the States.

Prior to the divestiture, Texas regulated the telephone industry, recognizing that the provision of telephone service is a monopolistic venture. In 1975, the Texas Legislature enacted the Public Utility Regulatory Act (PURA) to regulate the telephone industry in the State. The PURA operates as a substitute for "the normal forces of competition which operate to regulate prices in a free enterprise society" and prohibits any public utility from charging rates or providing services that are "unreasonably preferential, prejudicial or discriminatory." TEX.REV.CIV. STAT.ANN. art. 1446, §§ 2, 38, 45 (Vernon Supp.1995). The Legislature also created the Public Utilities Commission (PUC) to oversee the regulation of public utilities in Texas. *Id.* § 32.

After the divestiture, the PUC recognized that it needed to create a new rate structure for telephone service in Texas. Consequently, the PUC began proceedings in Texas to determine a rate structure for intraLATA and interLATA telephone service. The proceedings involved not only the Bell operating companies, but also long distance companies, such as Sprint, MCI, and AT & T. These companies are called interexchange carriers ("IXCs"), a label created by the divestiture decree. *See Western Electric Co.*, 569 F.Supp. at 994; *AT & T Communications*, 777 S.W.2d at 368 (Mauzy, J., concurring). Although IXCs are long distance carriers, they must access the local telephone system to provide long distance service to their customers. Because IXCs used the local network and because their customers were more likely to be able to afford additional charges to their telephone bills, the PUC decided IXCs should help foot the cost of the local telephone system. Therefore, the PUC approved a tariff charging all IXCs an access service charge that was use-sensitive, i.e., that varied with the length and distance of the call. *See* Tex.Pub.Util.Comm'n, *Petition of Southwestern Bell Tel. Co. for Authority to Charge Rates*, Docket No. 5220, 10 TEX. P.U.C.BULL. 255 (May 14, 1984); Tex.Pub. Util.Comm'n., *Petition of the Public Utility Commission for an Inquiry Concerning the Effects of the Modified Final Judgment and the Access Charge Order Upon Southwestern Bell Tel. Co. & Independent Tel. Companies*, Docket No. 5113, 13 TEX.P.U.C.BULL. 493 (Nov. 17, 1986). The PUC determined that such a charge was necessary to achieve its primary goal of universal service, i.e., to have local telephone service that all Texas citizens could afford. *See id.* This goal of universal service could only be achieved by requiring IXCs to help defray the cost of a local telephone company's operating plant through the access service charge. *See id.* The Texas Supreme Court upheld the access rate structure set up by the PUC, finding, over the vigorous objections of the IXCs, that the rate structure was reasonable and non-discriminatory. *AT & T Communications*, 777 S.W.2d at 364–367.

## III. BELL'S TARIFF STRUCTURE

Ultimately, the question in this case is whether Bell's access service tariff, filed with the PUC and approved in *AT & T Communications,* controls the dealings between the parties. However, another tariff, Bell's general exchange tariff, also is at issue in this case and must be considered as well.

A tariff is a document which lists a public utility's services and the rates for those services. Pursuant to the PURA, tariffs must be filed with the PUC. TEX.REV. CIV.STAT.ANN. art. 1446c § 32. Before the divestiture, Bell had on file with the PUC its general exchange tariff, filed in 1976. The general exchange tariff sets the rates for Bell's local service, i.e., the charge for origination and termination of local calls, and lists particular services and equipment available for local service.

In 1984, after the divestiture, Bell also filed its access service tariff. The access service tariff sets the rates for the use of Bell's local exchange network by IXCs. As we described, the access service rates are primarily usage sensitive, i.e. rates which vary with the length and distance of the telephone call. Thus, the access service rates are generally higher than the local service rates.

## IV. FACTS

### A. The Configuration of Metro–Link's System

At the heart of this dispute are Bell's attempts to compel Metro–Link: (1) to pay access service rates for use of Bell's local exchange network; and (2) to use services listed in the access service tariff rather than the services contained in the general exchange tariff. If Bell had succeeded in its attempts, Metro–Link would have had to change the configuration of its system, which used rates and services under the general exchange tariff.

The configuration of Metro–Link's system was considered novel when it was set up in 1985, in part, because it enabled Metro–Link to provide INTRASTATE long distance service at rates cheaper than normal—essentially at local rates—creating cost savings to its customers. Metro–Link's system uses Direct Inward Dialing (DID) numbers and trunks and high-capacity T–1 lines, both purchased from Bell at flat rates. The DID services are included only in Bell's general exchange tariff. Using these facilities, Metro–Link provides what is called a point-to-point, foreign exchange (FX) service. Metro–Link's FX DID service allows Metro–Link's customers to call a number in a foreign exchange city (a city normally requiring a long distance call) at the local flat rate rather than at usage sensitive rates. Normally, these calls are long distance calls and entail access service charges. However, under Metro–Link's arrangement, these calls involve only the flat rates reserved for local calls. Metro–Link assigns the DID numbers to its customers, primarily businesses in the Galveston–Texas City area, who in turn give the numbers to their Houston customers. With Metro–Link's FX DID configuration, callers based in Houston are able to telephone Metro–Link's business customers in the Galveston–Texas City area toll-free (i.e. at a flat rate without an access service charge), and Metro Link's business customers in the Galveston–Texas City area are also able to call the Houston area toll-free. In addition to this two-way business service, Metro–Link provides a one-way business service that simply allows its Galveston–Texas City business customers to call Houston at a flat monthly rate. Metro Link also offers a flat-rated, one-way residential service for evenings and weekends.

### B. The Dealings Between Metro–Link and Bell

Metro–Link purchased the FX DID service from Bell in September 1985 and began its operations in January 1986. Metro–Link also purchased directory listings for the DID numbers from Bell. By the spring of 1987, Bell notified Metro–Link that the service arrangement violated Bell's tariffs because Metro–Link was an IXC providing long distance service at local rates. According to Bell, a long distance service provider is required to use the rates and services in the access service tariff. Bell informed Metro–Link that it would have to convert to services

offered under the access service tariff and pay the access service rates. Negotiations to convert Metro–Link's service arrangement lasted through the end of 1987. Metro–Link ultimately refused to convert its service arrangement and Bell notified Metro–Link of its intent to disconnect Metro–Link's "DID arrangement and DID listings." In the fall of 1987, Bell removed some of Metro–Link's business customers from the 1988 white pages directory.

## C. The PUC Complaint

In January of 1988, Metro–Link complained to the PUC of the following: (1) Bell's removal of Metro–Link's business customers from the white pages directory; and (2) Bell's attempts to get Metro–Link to pay access service rates and use access service tariff products and services. The PUC ordered the status quo preserved. To this day, Metro–Link continues to use the FX DID service at a flat rate. The PUC proceeding is still pending, eight years after it began.

## D. Suit and Trial

In March of 1989, Metro–Link and its principals filed this suit against Bell and two of its employees alleging multiple causes of action. In June of 1993, the case went to trial on Metro–Link's claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Antitrust Act and DTPA. The jury returned a verdict in favor of Metro–Link on all claims, except the DTPA claim. For each favorable claim, the jury awarded Metro–Link $1,570,-000.00 in actual damages. The jury also awarded $1,000,000.00 in attorney's fees and $50,000.00 in punitive damages on its claim for breach of the duty of good faith and fair dealing. Metro–Link elected recovery under its antitrust claim.

The trial court rendered judgment awarding Metro–Link $5,710,000.00 in damages (three times $1,570,000.00 in actual damages, plus $1,000,000.00 in attorney's fees) against Bell. *See* TEX.BUS. & COM.CODE ANN. § 15.21(a)(1) (Vernon 1987). The court's judgment also ordered that Metro–Link take nothing from the two Bell employees sued

individually. After filing several post-judgment motions, Bell perfected this appeal.

Although Bell and Metro–Link raise many issues, we address only what we conclude is the dispositive issue on appeal: Whether Bell's actions to compel Metro–Link to use services under the access service tariff and to pay access service rates are immune from suit under the filed rate doctrine and the holding in *AT & T Communications*. We conclude that they are.

## V. IMMUNITY

### A. The Filed Rate Doctrine

In points of error three and four of its appellate brief, Bell contends the *filed rate doctrine* bars each of Metro–Link's claims as a matter of law. The filed rate doctrine was created because of the unique nature of tariffs filed with the appropriate regulatory agency.

Filed tariffs govern a utility's relationship with its customers and have the force and effect of law, until suspended or set aside. *See Keogh v. Chicago & Northwestern Railway*, 260 U.S. 156, 162–163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922). "The 'filed rate' doctrine says, in essence, that any rate filed with and approved by the appropriate regulatory agency has the imprimatur of government and cannot be the subject of legal action against the private entity that filed it." *See* Keith A. Rowley, *Immunity from Regulatory Price Squeeze Claims: From Keigh, Parker, and Boerr to Town of Concord and Beyond*, 70 TEX.L.REV. 399, 400 n. 6 (1991). Regulated entities are prohibited from charging rates for their services other than those properly filed with the appropriate regulatory authority. *Id.* at 413–14 (citing *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981)). Likewise, the doctrine precludes the rate-setting body from altering filed and approved rates retroactively. *Id.* at 414 (citing *Arkansas Louisiana Gas*, 453 U.S. at 578, 101 S.Ct. at 2930).

The filed-rate doctrine "has been extended across the spectrum of regulated utilities." *Arkansas Louisiana Gas*, 453

U.S. at 579, 101 S.Ct. at 2930. Although the doctrine has been applied primarily in the context of federal regulation, it applies equally where state law creates a state agency and a statutory scheme pursuant to which the state agency determines reasonable rates. *Wegoland, Ltd. v. NYNEX Corp.*, 806 F.Supp. 1112, 1115 (S.D.N.Y.1992). Thus, the filed rate doctrine may apply to bar state causes of action as well as federal causes of action. *Arkansas Louisiana Gas*, 453 U.S. at 579–582, 101 S.Ct. at 2931–32; *Wegoland*, 806 F.Supp. at 1116.

■ The filed rate doctrine prohibits a customer from claiming a lower rate than the rate the regulated entity has filed with the regulatory agency, because the filed rate alone governs the relationship between the regulated entity and its customer. *Prentice v. Title Ins. Co. of Minn.*, 176 Wis.2d 714, 500 N.W.2d 658, 660 (1993). Allowing a state court to award damages to a customer based on a rate lower than the filed rate would undermine the regulatory scheme. Id. at 661. To begin with, a plaintiff could obtain greater relief from the court than from the regulatory agency. *Arkansas Louisiana Gas*, 453 U.S. at 579, 101 S.Ct. at 2931; *Prentice*, 500 N.W.2d at 661. Moreover, the utility is to offer non-discriminatory rates to its customers. See art. 1446 §§ 38, 45. Allowing the utility to vary from its tariffed rates would open the door for discrimination by the utility.

■ The filed rate doctrine conclusively presumes that both a utility and its customers know the contents and effect of published tariffs. *Teleconnect Co. v. U.S. West Communications, Inc.*, 508 N.W.2d 644, 647 (Iowa 1993) (citing *Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 127, n. 9, 110 S.Ct. 2759, 2766 n. 9, 111 L.Ed.2d 94 (1990)). Neither the customer's ignorance nor the utility's misquotation of the applicable tariff provides refuge from the tariff or alters the tariff's terms. *Teleconnect*, 508

N.W.2d at 647. Thus, even though the rule may seem harsh to those injured, a customer of a utility has no cause of action against a utility for alleged negligent or intentional misquotation of a tariffed service when the filed rate doctrine applies to the case.[1] Id. To allow otherwise, would give a preference to, and discriminate in favor of, the customer who received the representation. Id.

■ The question of whether the filed rate doctrine shields a defendant from liability is a question of law and therefore, is subject to *de novo* review. *See id.; see also Hull & Co., Inc. v. Chandler*, 889 S.W.2d 513, 517 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (questions of law are subject to de novo review).

## B. The Applicability of the Filed Rate Doctrine

■ Predictably, Bell & Metro–Link take diametrically opposed positions on whether the filed rate doctrine applies to this case. Bell argues that Metro–Link's service arrangement violates its tariffs and that it cannot be held liable in tort or contract for attempting to enforce its tariffs. Specifically, Bell argues that it cannot be held liable for requiring an IXC such as Metro–Link to pay the usage sensitive rates set out in Bell's access service tariff, which allows access to Bell's local exchange network (Metro–Link accesses Bell's local network by way of DID numbers and trunks). Bell claims that as an IXC, Metro–Link is required to pay the rates and use the services listed in the access service tariff.

Metro–Link, on the other hand, argues that this is not a rate case. Metro–Link asserts that it does not complain about the *rates* Bell charged for DID lines and trunks, but about Bell's anticompetitive *conduct* in attempting to deny DID numbers and trunks, a service Metro–Link alleges is essential to its survival.[2] According to Metro–

---

**1.** Metro-Link complains about the fact that Bell's management and employees either intentionally or negligently misquoted rates and services under Bell's tariffs and that Metro–Link's principals had little or no knowledge of Bell's tariffs. These facts do not preclude application of the filed rate doctrine.

**2.** Metro-Link also claims Bell damaged it by removing some of its business customers from Bell's white pages directory. Although the listings issue was not submitted as part of Metro–Link's antitrust claim, in our view, this issue is intertwined with Metro–Link's claims about DID service. Thus, if under Bell's tariffs, Metro–Link

Link, Bell never offered DID service at any rate, but only offered a feature group service under its access service tariff, which included FX service as an option, but not DID service. Hence, Metro–Link contends there is no filed rate for FX DID service under the access service tariff. Metro–Link also asserts that it is not an IXC.

Although Metro–Link's position is well argued and reasoned, we believe the filed rate doctrine applies. One reason the doctrine applies is because Metro–Link is an IXC as a matter of law. The undisputed evidence at trial establishes that Metro–Link uses Bell's local network to originate or terminate intra-LATA long distance service in the Houston LATA. This fact alone makes Metro–Link an IXC based on the testimony given at trial. At trial, one of Metro–Link's principals defined an IXC as "anyone who carries calls between two exchanges" (which includes calls between the Houston and Galveston/Texas City LATAS) and admitted that Metro–Link was an IXC according to that definition. He also acknowledged that the PUC considers Metro–Link an IXC. In addition, both parties' experts testified that Metro–Link was an IXC under the PUC's definition. That definition, as read to the jury, is, "any individual, partnership association, joint stock company trust, governmental entity or corporation engaged for hire in intrastate, inter-

state or foreign communication by wire or radio *between two or more exchanges*." [3] (emphasis added)

The fact that Metro–Link is an IXC is important because the PUC has determined that IXCs are a distinct class of customers in their use of the local exchange network and in their ability to help defray the costs of the local network. In fact, Bell's access service tariff was created specifically for IXCs, who, because of their unique position, must pay an access service charge for use of the local network. This could not have been more clearly affirmed in *AT & T Communications*.[4] 777 S.W.2d at 364–67. Earlier, we discussed the public policy behind this decision, which was decided upon and announced by the PUC. As stated in pronouncements of the PUC, Texas has a desire to provide universal local telephone service to its citizens. *AT & T Communications*, 777 S.W.2d at 368–371 (Mauzy, J. concurring). To achieve this goal, Bell and other local telephone providers need the extra revenues from IXCs to help defray the costs of the local network. If IXCs were allowed to avoid paying an access service charge, it would decrease the amount of money available to pay for the local network and cause the local telephone companies to increase local rates. This would undermine the policy of this state to provide local telephone service to *all* its citizens. Thus, allowing IXCs to use local exchange services to provide

was not entitled to DID service at all, or entitled to DID service at a higher rate, Metro–Link cannot claim damages for the removal of its listings after refusing to comply with the tariffs in these respects. Even if Metro–Link has such a claim independent of the DID issue, there is no evidence in the record that any Metro–Link business customer discontinued service because its listing was removed.

3. Relying on *Western Electric*, Metro–Link suggests that it is not an IXC because it provides only intraLATA, not interLATA, long distance service. *See Western Electric*, 569 F.Supp. at 994. In this regard, Metro–Link points out that *Western Electric* uses the term "IXC" only to describe long distance carriers such as AT & T, MCI or Sprint, which provide only interLATA service. We agree that *Western Electric* did not use the term "IXC" to describe intraLATA carriers. However, *Western Electric* did not involve the provision of intraLATA long distance service by non-Bell operating companies such as Metro–Link. The provision and regulation of intraLATA

long distance service was specifically left to the states. Consequently, the court did not have authority over this issue and therefore, there was no reason for the court to include within its definition of IXC a company providing only intraLATA long distance service.

4. Although both the PUC and the Texas Supreme Court approved the tariff in question requiring IXCs to pay the access service charge, this approval occurred after Metro–Link purchased the services from Bell, as Metro–Link points out in its brief. Metro–Link uses this fact to argue that the filed rate doctrine does not apply. However, as we stated in the body of the opinion, tariffs that are filed with the appropriate regulatory agency have the force and effect of law, until suspended or set aside. *Keogh*, 260 U.S. at 162–163, 43 S.Ct. at 49. Since Bell filed its access service tariff before Bell and Metro–Link had their dealings, the tariff already had the force and effect of law when the parties dealt with each other, and thus, Metro–Link cannot deny the tariff's effect. *See id.*

long distance service at flat rates rather than at access service rates, violates the policy of this state. *See id.*

Even though IXCs are required to pay an access service charge, Metro–Link claims that no filed rate exists in this case because it is providing a new service, i.e., FX DID service. According to Metro–Link, it is a new service because Metro–Link is using DID service in a way that it has never been used before—that is to provide intraLATA long distance service. Because the access service tariff contains no rate for this type of service, Metro–Link claims there is no filed rate. The evidence confirms that DID numbers and trunks have never been used to provide FX service and that the access service tariff does not specifically include FX DID service.[5] However, the fact that the access service tariff does not contain a rate for DID numbers and trunks does not mean, as Metro–Link suggests, that this is not a rate case and that Metro–Link, as an IXC, is not required to pay a usage sensitive rate pursuant to the access service tariff.

The evidence unequivocally shows that Metro–Link is an IXC and that it was violating Bell's access service tariff by using Bell's local exchange network, i.e., DID service, to provide long distance service at flat rates rather than at the access service rates approved by the PUC and affirmed in *AT & T Communications*. The current law and tariffs in this state simply do not contain any provisions to allow IXCs to access the local network without paying an access service charge nor do they give Bell the authority to allow IXCs to use the services without paying an access service charge. In fact, the PUC itself has said the following, which we think applicable to this case:

Under the PURA and the Commission's rules, if imaginative consumers or techno-logical or regulatory changes create a perceived problem for which a utility's tariff provides no solution, that presents an issue for resolution by this Commission, not by the monopoly provider of access service. In such instance, the utility should propose an amendment to its tariff.

*AT & T Communications v. Public Util. Comm'n,* 906 S.W.2d 209, 217 (Tex.App.—Austin 1995, writ pending). We think this quote confirms what we have stated previously in discussing the filed rate doctrine: the filed tariff controls who it applies to and what services are given. In fact, everything we have reviewed concerning the filed rate doctrine reflects a bias in favor of certainty and against novelty or change.

Metro–Link also argues that the filed rate doctrine is inapplicable because this case is not about an inappropriate rate, but about the denial of DID service. This exact issue came up before the Iowa Supreme Court in *Teleconnect.* We discuss the case because: (1) the facts are remarkably similar to those in this appeal; (2) we agree with the reasoning of the court; and (3) no Texas case exists on the issue.

In *Teleconnect,* U.S. West (formerly Northwestern Bell) erroneously told Teleconnect that a particular type of local telephone service was available to Teleconnect. 508 N.W.2d at 647. U.S. West subsequently corrected the misstatement, telling Teleconnect the service was not available under U.S. West's tariff because only a certain category of customer could use the service and Teleconnect did not fall within that category. Id. Unfortunately, U.S. West did not tell Teleconnect about its mistake before Teleconnect had acted on the representation *Id.* U.S. West offered Teleconnect a functionally equivalent service in a different tariff that contained higher prices. *Id.* However, Te-

---

5. In fact, Metro–Link's system makes such a novel use of DID service that the PUC is currently deciding whether Metro–Link can continue to use DID trunks to provide long distance service and if so, what the usage sensitive rate should be. In this regard, Bell has filed a motion asking us to take judicial notice of certain facts from the PUC proceedings. We grant Bell's motion in part and take judicial notice only of the fact the PUC is currently deciding whether: (1) Bell must offer a new access feature group for Metro-

Link's DID service with proper use restrictions to prevent tariff abuse or must offer that service under existing feature groups; (2) Bell must provide Metro–Link with special services arrangement or "SSAR" under the access tariff; or (3) Metro–Link must conform its services to existing tariff requirements. *See Office of Public Util. Counsel v. Public Util. Comm'n,* 878 S.W.2d 598, 599 (Tex.1994). Each alternative involves Metro–Link paying an access service charge of some amount.

leconnect claimed it could not make a profit at the higher prices. *Id.* Teleconnect sued for contract and tort damages suffered in reliance on the misstatement. *Id.* The lower court denied U.S. West's motion for summary judgment based on the filed rate doctrine. *Id.* at 646. The Iowa Supreme Court reversed. *Id.* at 650.

Teleconnect argued that the filed rate doctrine was inapplicable because it sought damages for conduct unrelated to the tariff rates. *Id.* at 648. Teleconnect asserted that U.S. West's alleged misrepresentations affected only the service Teleconnect would receive, not the price it would pay. *Id.* Here, Metro–Link advances a similar argument: that is, it seeks damages based only on Bell's attempts to deny DID service, not on the rates Bell tried to make it pay for those services. However, the court in *Teleconnect* rejected any rate/service distinction under the filed rate doctrine. *Id.* Citing to a previous case from its court, *Sheldon v. Chicago B. & Q.R. Co.,* 184 Iowa 865, 870, 169 N.W. 189, 190 (1918), the court noted that the filed rate doctrine insulates a utility from antitrust liability when it offers a service that violates its tariffs. In *Sheldon,* the customer purchased a ticket for a train that would make two stops. 169 N.W. at 190. However, the railroad company agreed to vary from its tariff by entering a contract to make two extra stops that normally would require a greater charge than the customer paid. Id. The train did not make the stops, the customer's goods were damaged, and the customer sued the railroad company. *Id.* The railroad company pled that it was immune from liability because of the filed rate doctrine. *Id.* The court agreed, holding that the railroad company was bound by its tariff, which did not include the extra stops. *Id.* Relying on *Sheldon,* the court in *Teleconnect* refused "to recognize agreements between utilities and customers that create prices or other terms beyond those set out in the applicable tariffs." 508 N.W.2d at 648.

We find many similarities between this case and *Teleconnect.* In *Teleconnect,* U.S. West told Teleconnect that Teleconnect did not fit the category of customer the tariff was designed to serve. Teleconnect did,

however, fit the category of customer for another tariff, which contained a service that was functionally equivalent but more expensive. Likewise, in this case, Metro–Link does not fit the category of customer that the general exchange tariff was designed to serve, i.e., local callers paying flat rates for local calls. However, Metro–Link does fit the category of customer for another tariff— the access service tariff. In fact, as we have stated already, the access service tariff was created specifically to apply to IXCs. As in *Teleconnect,* the access service tariff contains services similar to, but more expensive than, the services contained in the general exchange tariff. In short, Metro–Link does not qualify for FX DID service at flat rates, just like *Teleconnect* did not fit the category of customer to whom the lower rates were applicable.

Another similarity we see in this case and *Teleconnect,* is that the aggrieved party tried to frame the primary issue as involving a denial of service, rather than a dispute about rates. However, in both cases, the aggrieved party complained primarily because its rates would increase under the different tariff. As in *Teleconnect,* we refuse to make a distinction between service and rate. Therefore, we hold that Bell's attempt to get Metro–Link to conform its services and rates to the proper tariff is protected under the filed rate doctrine.

Metro–Link claims that *Teleconnect* is distinguishable because: (1) the service was only offered by U.S. West and never actually purchased or used by Teleconnect; (2) there was no question that the tariff prohibited the use of the offered service and that the tariff had been approved by the state regulatory agency; and (3) the *Teleconnect* court recognized a "competitor exception" to the filed rate doctrine, but simply did not apply it because there was no antitrust claim.

■ Although, once again, Metro–Link's position is very artfully and persuasively argued, we disagree that *Teleconnect* is distinguishable. First, under the filed rate doctrine, it makes no difference that Bell did not finally take action against Metro–Link until almost a year after Metro–Link began operation. Under the doctrine, Bell is not liable to Metro–Link for intentionally or negligently offering services at rates that violated its

tariffs and then disavowing those services and rates in attempting to enforce its tariffs. *Teleconnect,* 508 N.W.2d at 647.

Second, it is irrelevant that no tariff provision expressly prohibits the use of DID numbers and trunks for providing intraLATA long distance service, i.e., FX DID service. This is clear from *Sheldon.* That case did not turn on the fact that the tariff specifically prohibited the railroad from making the two extra stops. Rather, the court stated merely that the stops were not included in the tariff. The key fact was that the offer of the additional stops was a deviation from the tariff, which could not be done. Likewise, in this case, we have one tariff designed for local callers at flat rates and another designed for long distance callers at usage sensitive rates. By allowing an IXC to use a general exchange tariff service at a flat rate to provide long distance service, Bell deviated from both the general exchange tariff and the access service tariff.

We also note that the undisputed testimony at trial shows that Metro–Link did not want to pay an access service charge or usage sensitive rate for DID numbers and trunks. It wanted DID service only at a flat rate. In fact, the evidence shows that Metro–Link could not afford DID service if it had to pay a usage sensitive rate. Thus, the primary reason Metro–Link refused the feature group options offered by Bell was because Metro–Link would have to pay an access service charge, which it could not afford. This evidence confirms what we stated earlier; that the dispute primarily was about rates and not services.

■ Finally, *Teleconnect* cannot be distinguished on the basis of the so-called "com-

petitor exception." *Teleconnect* recognizes a federal competitor exception to the filed rate doctrine in antitrust cases "to avoid the potential anticompetitive conduct that can occur when utilities file tariffs in a predatory and discriminatory manner." 508 N.W.2d at 649. That exception, if one exists, simply does not apply here. To begin with, Metro–Link does not claim that Bell used its rate making power in a predatory or discriminatory manner or that the access service tariff is discriminatory or predatory in nature.[6] Indeed, that issue was resolved in *AT & T Communications.* 777 S.W.2d at 364–367. Rather, Metro–Link claims the filed rate doctrine does not apply because no specific rate exists for its service. As we discussed, that fact does not preclude application of the filed rate doctrine to both services and rates that clearly violate a utility's filed tariff. *Teleconnect,* 508 N.W.2d at 648. For these reasons, we conclude that a competitor exception, if one exists, does not apply to this case.

In its final attempt to avoid application of the filed rate doctrine, Metro–Link argues that Bell could have offered DID service by way of a special services arrangement or SSAR, under section 12 of the access service tariff. Section 12 permits Bell to provide services not otherwise offered in its tariffs.[7] We find this argument unconvincing. Even if Bell could have offered FX DID service by way of an SSAR under the access service tariff, it still would had to have been at usage sensitive rates because Metro–Link was an IXC using the services to provide intraLATA long distance service. *AT & T Communications,* 777 S.W.2d at 364–367. To allow Bell to do otherwise would erode Bell's financial

---

6. Competitors are not the intended beneficiaries of public utility regulation. *See Essential Communications v. American Tel. & Tel. Co.,* 610 F.2d 1114, 1121 (3rd Cir.1979). The purpose of public utility regulation is to ensure that public utilities adhere to their filed tariffs in their dealings with their *customers. Id.* (emphasis added). If utilities are free to depart from filed tariffs, they can discriminate between customers. *Id.* Thus, the idea behind the competitor exception is that concern about a utility's compliance with its tariffs does not come into play when the utility is dealing with a competitor.

7. The requirements for an SSAR are: (1) the requested service or arrangements are not of-

fered under other sections of this tariff; (2) the facilities utilized to provide the requested service or arrangements are of a type normally used by the Telephone Company in furnishing its other services; (3) the requested service or arrangements are provided within a LATA; (4) the requested service or arrangements are compatible with other Telephone Company services, facilities and its engineering and maintenance practices; and (5) this offering is subject to the availability of the necessary Telephone Company personnel and capital resources. At trial, the experts disagreed about whether Metro–Link's service met the requirements of section 12.

base, conflict with the PUC's stated goal of universal service, and violate the access service tariff filed with the PUC and approved by both the PUC and the Texas Supreme Court.

## CONCLUSION

In summary, Metro–Link is an IXC. Bell filed an access service tariff specifically designed for IXCs and the PUC determined that IXCs must pay access service rates for using the local network. The Texas Supreme Court approved this determination in *AT & T Communications*. Because Bell filed the access service tariff before Bell and Metro–Link began dealing with each other, the filed rate doctrine applies. Furthermore, because Metro–Link is the category of customer to whom the access service tariff applies, and not the category of customer to whom the general exchange tariff applies, Bell cannot be held liable under Metro–Link's suit for attempting to make Metro–Link use the services and prices listed on the access service tariff. We therefore sustain Bell's points of error three and four. Accordingly, we reverse the trial court's judgment and render judgment that Metro–Link take nothing.