NO. 07-09-0091-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

APRIL 24, 2009
______________________________

ALTON ARMSTRONG, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE 251ST DISTRICT COURT OF POTTER COUNTY;

NO. 50,712-C; HONORABLE ANA ESTEVEZ, JUDGE
_______________________________


Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
ORDER OF ABATEMENT AND REMAND
          On March 16, 2009, appellant, Alton Armstrong, filed a notice of appeal from a
judgment entered by the 251st District Court of Potter County, Texas, in cause number
50,712-C. In this notice, appellant requests the trial court relieve his appointed counsel
from continuing to represent appellant on appeal and to appoint new appellate counsel. 
On this basis, we now abate and remand this cause. 
          Upon remand, the judge of the trial court is directed to immediately cause notice to
be given of and to conduct a hearing to determine: (1) whether appellant desires to
prosecute this appeal; (2) if appellant desires to prosecute this appeal, whether appellant
is indigent; (3) if appellant is indigent, whether appellant is being adequately represented
on appeal by trial counsel; (4) if appellant is indigent and not being adequately
represented, whether appellant should be appointed new appellate counsel; and (5) what
orders, if any, should be entered to assure the filing of appropriate notices and
documentation to dismiss appellant’s appeal if appellant does not desire to prosecute this
appeal. If the trial court determines that new counsel should be allowed to represent
appellant on appeal, the court should cause the clerk of this court to be furnished the
name, address, and State Bar of Texas identification number of the newly-appointed or
newly-retained attorney. 
          The trial court is directed to: (1) conduct any necessary hearings; (2) make and file
appropriate findings of fact, conclusions of law, and recommendations and cause them to
be included in a supplemental clerk’s record; (3) cause the hearing proceedings to be
transcribed and included in a supplemental reporter’s record; (4) have a record of the
proceedings made to the extent any of the proceedings are not included in the
supplemental clerk’s record or the supplemental reporter’s record; and (5) cause the
records of the proceedings to be sent to this court. Tex. R. App. P. 38.8(b)(3). In the
absence of a request for extension of time from the trial court, the supplemental clerk’s
record, supplemental reporter’s record, and any additional proceeding records, including
any orders, findings, conclusions, and recommendations, are to be sent so as to be
received by the clerk of this court not later than May 26, 2009.  
                                                                                      Per Curiam
Do not publish.



 . . .” See AT&T Communications of\
the Southwest v. Public Utility Com’n of Texas, 906 S.W.2d 209, 213 n.6 (Tex.App.–Austin\
1995, writ denied). \
'

var WPFootnote12 = '
LEC revenues are recorded in a series of uniform accounts established by the\
FCC. See 47 C.F.R. § 32.4999(n) (2001). “Network Access Revenues” are deposited in\
FCC Accounts 5080-5084 and are “derived from the provision of exchange access services\
to an interexchange carrier or to an end user of telecommunications services beyond the\
exchange carrier’s network.” 47 C.F.R. § 32.4999(i) (2001). \
'

var WPFootnote13 = '
The tax in issue related to Account 5081 is $24,115,771.14.
\
'

var WPFootnote14 = '
The tax in issue related to Account 5083 is $18,922,278.76.
\
'

var WPFootnote15 = '
The tax in issue related to Account 5160.1 is $98,527.49.
\
'

var WPFootnote16 = '
Section 171.1032 of the Texas Tax Code was deleted in 2008. Nevertheless,\
because this statute was applicable during the period at issue, we will refer to this statute\
as “Section 171.1032" or “§ 171.1032" throughout this opinion for convenience.
\
'

var WPFootnote17 = '
For convenience, this provision will be referred to as “34 Tex. Admin. Code § 3.557\
(1992)” throughout the remainder of this opinion. This Rule was amended in 2003 to\
further clarify the Comptroller’s exemption. See 34 Tex. Admin. Code § 3.557(e)(39)\
(2008), as amended, 28 Tex. Reg. 1218 (Effective: February 12, 2003). The new Rule is\
prospective in its application and does not appy here. “Adjudication deals with what the\
law was; rulemaking deals with what the law will be.” Bowen v. Georgetown University\
Hospital, 488 U.S. 204, 221, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J.,\
concurring). See Amarillo Independent School Dist. v. Meno, 854 S.W.2d 950, 958\
(Tex.App.–Austin 1993, writ. denied).
\
'

var WPFootnote18 = '
Comptroller of Public Accounts, Star System Accession No. 830R0687A12\
(Effective: March 30, 1983). The State Tax Automated Research (STAR) System may be\
accessed at: http://www.window.state.tx.us/taxinfo/franchise.
\
'

var WPFootnote19 = '
STAR Accession No. 8901L0929D04 (January 1, 1989).
\
'

var WPFootnote20 = '
STAR Accession No. 9403L1354G06 (March 25, 1994). \
'

var WPFootnote21 = '
STAR Accession No. 9803494L (March 6, 1998).
\
'

var WPFootnote22 = '
“Although opinions of the Attorney General are merely advisory and not binding\
on the courts, they are entitled to careful consideration”; Welmaker v. Cuellar, 37 S.W.3d\
550, 552 (Tex.App.–Austin 2001, pet. denied), and are “highly persuasive.” Plainview\
Independent School Dist. v. Edmonson Wheat Growers, Inc., 681 S.W.2d 299, 302\
(Tex.App.–Amarillo 1984, writ ref’d n.r.e.).
\
'

var WPFootnote23 = '
Bell deposits EUCL revenues in FCC denominated accounts designated as\
“network access accounts.” 47 C.F.R. § 49999(i) (1995). “Network Access Accounts”\
include “revenues derived from the provision of exchange access services to . . . an end\
user of telecommunications services beyond the exchange carrier’s network.” Id. \
(emphasis added).
\
'

var WPFootnote24 = '
“Disposal” means “the power or authority to dispose or make use of as one\
chooses.” Merriam-Webster’s Collegiate Dictionary at 361. \
'

var WPFootnote25 = '
Texas Public Utility Commission defines the term “services,” in pertinent part, as\
follows:
\
\
                                Has its broadest and most inclusive meaning. The term includes any act \
performed, anything supplied, and any facilities used or supplied by a public\
utility in the performance of the utility’s duties . . . to its patrons . . . and the\
public. The term also includes the interchange or facilities between two or\
more public utilities. . . .
\
\
26 Tex. Admin. Code § 23.3-5 (2008) (emphasis added), as adopted, 23 Tex. Reg. 9322\
(Effective date: September 16, 1998). \
'

var WPFootnote26 = '
Similar interpretations have been applied by courts in litigation involving Public\
Utilities Commission orders; Allcomm Long Distance, Inc., 902 S.W.2d at 664 (access\
service involves use of the LEC’s local exchange telephone networks to connect long\
distance calls), and tariff litigation. See Southwestern Bell Telephone Co. v. Metro-Link\
Telecom, 919 S.W.2d 687, 690 (Tex.App.–Houston [14th Dist.] 1996, writ denied) (use of\
local network to provide long distance service termed an access service); AT&T\
Communications of the Southwest, 906 S.W.2d at 213 n.6 (Bell’s State Access Service\
Tariff included end user access charges).
\
'

var WPFootnote27 = '
As director of access regulatory, Bell’s representative testified that he dealt with\
the FCC and various state public service commissions on issues related to “access\
services, interstate, and state access services.” \
'

var WPFootnote28 = '
The term “operator service” is defined as “[a] service using a live operator or\
automated operator functions to handle telephone service such as toll calling using collect,\
third number billing, and calling card services.” Tex. Util. Code Ann. at § 55.081. The\
terms “toll call” and “long distance call” are interchangeable. See Merriam-Webster’s\
Collegiate Dictionary at 1315; (“toll: a charge for a long-distance telephone call”). \
'

var WPFootnote29 = '
EUCL and Special Access charges are Network Access Revenues; 47 C.F.R. §\
32.4999(i) (2001), “derived from the provision of exchange access services to an\
interexchange carrier or to an end user of telecommunications services beyond the\
exchange carrier’s network.” Id. As such, both EUCLs and Special Access charges are\
subject to the same analysis here. \
'

var WPFootnote30 = '
Bell does not challenge the constitutionality of applying the franchise tax to its\
access service revenues. The Texas franchise tax is constitutional; Ford Motor Co. v.\
Beauchamp, 308 U.S. 331, 334-35, 60 S.Ct. 273, 84 L.Ed. 304 (1939), and states are\
permitted to tax telephone calls that originate or terminate within a state. Goldberg v.\
Sweet, 252, 264, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). See Complete Auto Transit, Inc.\
v. Brady, 430 U.S. 274, 279-80, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).
\
'

var WPFootnote31 = '
See also Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 93, 95-96, 68 S.Ct.\
1475, 92 L.Ed. 1832 (1948) (state franchise tax on a gas pipeline company involved in\
interstate commerce for local activities such as “maintaining, keeping in repair and\
manning facilities used to transport gas upheld as “doing business” in Mississippi); Utah\
Power & Light Co. v. Pfost, 286 U.S. 165, 182-83, 52 S.Ct. 548, 76 L.Ed. 1038 (1932) (A\
“tax may indirectly and incidentally affect such commerce, just as any taxation of railroad\
and telegraph lines does, but this is not a forbidden burden or interference.”)
\
'

var WPFootnote32 = '
STAR Accession No. 7208H1005C09 (February 2, 1972). \
'

var WPFootnote33 = '
Comptroller of Public Accounts, STAR Accession No. 7603R0198E10 (Effective:\
March 24, 1976).
\
'

var WPFootnote34 = '
Comptroller of Public Accounts, STAR Accession No. 7905R1012D02 (Effective:\
May 1, 1979).
\
'

var WPFootnote35 = '
Comptroller of Public Accounts, STAR Accession No. 830R0687A12 (Effective:\
March 30, 1983).
\
'

var WPFootnote36 = '
STAR Accession No. 8901L0929D04 (January 1, 1989). The Comptroller’s Letter\
Ruling also indicated that, due to previous correspondence from the Comptroller’s office,\
Bell might have been misled as to whether the Comptroller viewed access service charges\
as charges for an intrastate or interstate service. The Comptroller made the following\
concession:
\
\
                                Therefore, we will not set up the access charges in Accounts 508 or 509 in\
the audits we have in progress. However, this letter should put you on notice\
that we consider this to be a taxable receipt, and for franchise tax purposes,\
includable in the next tax return due on June 15, 1989.
\
\
(emphasis added). \
'

var WPFootnote37 = '
STAR Accession No. 9803494L (March 6, 1998); STAR Accession No. 9403329L\
(March 25, 1994); STAR Accession No. 9203L1230G09 (March 19, 1992).
\
'

var WPFootnote38 = '
STAR Accession No. 200011027H (Nov. 14, 2000). \
'

var WPFootnote39 = '
Bell contends the Comptroller should have adopted a rule to this effect through\
formal rule making rather than using an ad hoc method such as adjudication. See Texas\
Ass’n of Long Distance Telephone Companies (TEXALTEL) v. Public Utility Com’n of\
Texas, 798 S.W.2d 875, 887 (Tex.App.–Austin 1990, writ denied) (an ad hoc rule is “an\
agency statement that interprets, implements, or prescribes agency law or policy”). The\
Comptroller has discretion to engage in formal rule-making and “the power to enforce state\
tax collection statutes due to changes in the constitution or laws of the United States and\
judicial interpretations thereof.” § 111.002 (a). Thus, the Comptroller had discretion to\
proceed by general rule or by ad hoc adjudication. See City of El Paso v. Public Utility\
Com’n of Texas, 883 S.W.2d 179, 188 (Tex. 1994); South Plains Lamesa Railroad, Ltd.\
v. High Plains Underground Water, 52 S.W.3d 770, 782 (Tex.App.–Amarillo 2001, no pet.)\
(Quinn, J., concurring) (citing Securities and Exch. Comm’n v. Chenery Corp., 332 U.S.\
194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Given the newly created competitive\
markets in the telephone industry in the 1980s and 1990s largely due to evolving\
technological advances coupled with the creation of new federal and state\
telecommunication regulatory regimes charged with balancing competing statutory\
objectives, we cannot say the Comptroller abused his discretion here by proceeding on an\
ad hoc or “case-by-case” basis. See Southwestern Bell Tel. Co. v. Public Util. Comm’n,\
745 S.W.2d 918, 926-27 (Tex.App.–Austin 1988, writ denied). Moreover, the Comptroller’s\
policy related to EUCLs does not represent a departure from prior guidance regarding \
apportionment of LEC “access charges.” Thus, any possible reliance by Bell on the\
Comptroller’s past decisions would not require a different result. This is particularly so\
where Bell received guidance by letter in 1989. \
'

var WPFootnote40 = '
Bell’s contention that an auditor’s inconsistent tax treatment of a telephone\
company’s EUCL charges, as evidenced in the Administrative Law Judge’s fact statement\
in Hearing No. 35,677, negates the Comptroller’s consistent tax treatment is unpersuasive. \
The Comptroller cannot be estopped by the erroneous or negligent acts of its agents or\
employees; S&H Marketing Group, Inc. v. Sharp, 951 S.W.2d 265, 266-67\
(Tex.App.–Austin 1997, no writ), and a failure to enforce a tax statute or Comptroller policy\
or rule does not establish an affirmative policy to the contrary. Sharp v. House of Lloyd,\
Inc., 815 S.W.2d 245, 248 (Tex. 1991). \
'

var WPFootnote41 = '
The Henderson court aptly observed:
\
\
                                Clearly the tax was not a tax on the interstate business carried on over or by\
means of the bridge, because the bridge company did not transact such\
business. The business was carried on by the persons and corporations\
which paid the bridge company tolls for the privilege of using the bridge.
\
\
166 U.S. at 154. In Newell Bridge & Railway Company v. Dailey, 451 U.S. 942, 101 S.Ct.\
2026, 68 L.Ed.2d 331 (1981), Justices White and Blackmun, dissenting from a denial of\
a petition for writ of certiorari, opined that the Supreme Court’s holding in Henderson\
Bridge Co. would likely be upheld under the test established in Complete Auto Transit, Inc.\
v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) because the state franchise\
tax was apportioned and indicated that, had the tax in Detroit International Bridge been\
apportioned, Detroit International Bridge would have been upheld as well. Dailey, 451 U.S.\
at 944-45 (White, J., Blackmun, J., dissenting). Thus, contrary to Bell’s assertions, our\
analysis is the same regardless whether we apply United States Supreme Court precedent\
prior to, or after, adoption of the Complete Auto test for determining whether Texas’s\
franchise tax including “access charges” runs afoul of the Commerce Clause. See fn. 32,\
supra. \
'

var WPFootnote42 = '
Telephone service contracts between the subscriber and an LEC, such as Bell, are\
analogous to equipment leasing arrangements. See 70 Tex. Jur. 3d Telecommunication\
§ 118 (1999) (“The usual contract for telephone service amounts to a lease of certain\
instrumentalities to the subscriber in consideration of a prescribed sum each month.”) See\
generally Kelly v. Southwestern Bell Telephone Co., 248 S.W. 658, 659 (Tex. Comm’n\
App. 1923, judgm’t. adopted). Such contracts are intrastate in nature. See Puget Sound\
Stevedoring Co. v. Tax Com’n State of Washington, 302 U.S. 90, 94, 58 S.Ct. 72, 82\
L.Ed.2d 68 (1937) (if a company acts as a labor or employment bureau and supplies labor\
for the use of a shipowner to load a vessel, it is no part of interstate commerce even\
“though transactions of such commerce were increased thereby”); Young & Company of\
Houston v. Calvert, 405 S.W.2d 174, 175 (Tex.Civ.App.–Austin 1966, writ ref’d), cert.\
denied, 398 U.S. 914, 87 S.Ct. 866, 17 L.Ed.2d 786 (1967) (equipment leasing contracts\
for machinery utilized by stevedores to load ocean-going vessels represents an\
“independent transaction preparatory to” engaging in foreign commerce–leases are local\
transactions). See Atty. Gen. Op. No. C-86 (May 30, 1963) (rental revenue derived from\
automobiles, trucks, tow boats, and barges is “gross receipts from business done within\
Texas,” regardless whether the vehicles are used by the lessees outside of Texas – to be\
interstate, lessors must perform services with respect to the rental equipment outside of\
Texas). \
'

var WPFootnote43 = '
This transmission is extremely limited. Expert testimony in the record indicates\
that, before the caller completely dials the long distance number, the call has reached the\
IXC’s long distance switch.
\
'

var WPFootnote44 = '
STAR Accession No. 200011027H (Nov. 14, 2000). \
'

var WPFootnote45 = '
“Enable” is defined as “to provide with the means or opportunity; to make possible,\
practical, or easy.” Merriam-Webster’s Collegiate Dictionary at 409. \
'

var WPFootnote46 = '
The requirements for equal protection under the United State Constitution and the\
Texas Constitution are substantially the same. Rylander v. 3 Beall Bros., 3, Inc., 2 S.W.3d\
562, 567 (Tex.App.–Austin 1999, no pet.). See Tex. Const. art. VIII, § 1. \
'

var WPFootnote47 = '
An IXC’s revenue from interstate, long distance services is clearly exempt from\
apportionment as a Texas receipt under franchise tax rules. For purposes of apportioning\
earned surplus under the franchise tax, transportation companies must “report Texas\
receipts from transportation services in intrastate commerce.” 34 Tex. Admin. Code §\
3.557(d)(41) (1992). For purposes of apportioning taxable capital under the franchise tax,\
transportation companies must report Texas receipts from transportation services by\
“including receipts derived from the transportation of goods or passengers in intrastate\
commerce.” 34 Tex. Admin. Code § 3.549 (1998). \
'

var WPFootnote48 = '
Bell attempts to draw an analogy between EUCLs and charges by transportation\
companies shipping interstate when there is an intrastate leg involved with the interstate\
shipment. Such an analogy fails, however, because Bell is not involved in interstate\
“business,” i.e., an EUCL is a service charge for access to its equipment and facilities\
located in Texas. As stated earlier, there is simply no interstate component to the service\
Bell is offering. \
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







NO. 07-07-0172-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

 OCTOBER 28, 2008

______________________________


SOUTHWESTERN BELL TELEPHONE COMPANY, APPELLANT

V.

SUSAN COMBS, SUCCESSOR-IN-INTEREST TO CAROLE KEETON STRAYHORN,
COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS,
AND GREG ABBOTT, ATTORNEY GENERAL FOR THE STATE OF TEXAS, 
APPELLEES

_________________________________

FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY;

NO. D-1-GN-02-004559; HONORABLE MARGARET A. COOPER, JUDGE

_______________________________

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


OPINION


          Appellant, Southwestern Bell Telephone Company (Bell), appeals from entry of
summary judgment in favor of Appellees, Susan Combs, successor in interest to Carole
Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott,
Attorney General of the State of Texas, on Bell’s claim seeking a refund of franchise taxes. 
The parties filed competing motions for summary judgment below. The trial court granted
the State’s motion and denied Bell’s motion. Bell appeals the trial court’s ruling and seeks
summary judgment in its favor. In support, Bell asserts the trial court erred in finding (1)
Bell’s end user common line charges, special access charges, and operator assistance
charges are Texas receipts for state franchise tax apportionment purposes; (2) the
Comptroller’s application of the franchise tax apportionment statute and rules to Bell did
not violate equal protection guarantees; and (3) certain testimony by Bell’s experts was
properly excluded. We affirm.
Background
          In December 2002, Bell filed suit to recover $43,136,577.39 in franchise taxes and
interest paid under protest to the Comptroller.


 For calendar years 1996-2001,


 the
Comptroller apportioned Bell’s charges for customer access to its local telephone network
to complete long distance calls and pay-per-use services such as operator assistance as
Texas receipts. Bell asserts these charges are exempt from apportionment as Texas
receipts because they constitute “receipts from interstate calls” or “revenues from calls in
interstate commerce.”  
          This case necessarily involves technical and legal issues unique to the telephone
industry. Events that occurred in the telephone industry nationwide and in Texas from the
early 1980s through 2001 comprise the backdrop for understanding the issues
underscoring this appeal. As a result, it is necessary that we describe in greater detail
Bell’s operation during the period at issue as well as the applicable regulatory history
underlying the franchise tax exemptions sought by Bell.
          I.        The Antitrust Consent Decree 
          Before 1982, American Telephone and Telegraph Company (AT&T) dominated the
national telecommunications industry. AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 414,
119 S.Ct. 721, 142 L.Ed.2d 835 (1999). AT&T and its corporate affiliates, known as the
“Bell System,” virtually controlled all long-distance telephone service, most local telephone
service, and a substantial amount of all telephone equipment manufacturing. See United
States v. American Tel. & Tel. Co., 552 F.Supp. 131, 222-23 (D.D.C. 1982), aff’d sub nom.
Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). 
However, in 1982, AT&T entered into an antitrust consent decree, known as the
Modification of Final Judgment (MFJ) that ended its industry dominance. 552 F.Supp. at
160-170, 222-234.
          Under the MFJ, AT&T was required to divest itself of local exchange subsidiaries
and was grouped into regional operating companies which became known as the “Bell
Operating Companies (BOCs).” See 47 U.S.C. § 153 (4) (2001); SBC Communications,
Inc. v. F.C.C., 154 F.3d 226, 230 (5th Cir. 1998). Bell was a BOC and provided
telecommunications services for customers physically located in Kansas, Arkansas,
Oklahoma, Missouri, and Texas. The United States was then divided into 161 Local
Access Transport Areas (LATAs)


 within which BOCs were permitted to operate and
provide local telephone service. 154 F.3d at 231. Within each LATA were local exchange
carriers (LECs)


 that connected their customers’ telephones to their networks and facilities. 
Bell operates as an LEC in LATAs in Texas and other states.  
          Because the MFJ permitted BOCs and/or LECs to retain their state-regulated, local
service monopolies, they became subject to various restrictions on their lines of business. 
The restrictions were intended to ensure that the BOCs would not use their monopoly
control over LECs to impede competition in other markets. United States v. Western Elec.
Co., 12 F.3d 225, 229 (D.C. Cir. 1993). For instance, an LEC might find it particularly easy
to attract local customers to contract for its long distance service and use its control of local
service to place its long distance competitors at a disadvantage. Iowa Utilities Board, 525
U.S. at 416. Thus, one such restriction prohibited LECs from offering any long distance
service between LATAs, or interLATA service.


 See Id.; SBC Communications, 154 F.3d
at 230; Western Elec. Co., 12 F.3d at 228. Thus, during the relevant time period, Bell was
prohibited from providing any long distance telephone services.


 
          II.       Long Distance Telephone Service
          Because LECs such as Bell were prohibited from providing long distance telephone
service, long distance calls or interLATA calls were transmitted by interexchange carriers
(IXCs).


 AT&T Communications of Texas, L.P. v. Southwestern Bell Telephone Co., 186
S.W.3d 517, 521-22 (Tex. 2006). Under the MFJ, each LEC was allowed to transmit
telecommunications information only between points within a single LATA, providing what
is, basically, the traditional local telephone service. The MFJ required LECs to provide
their customers and IXCs equal exchange access


 to their network facilities for the purpose
of permitting IXCs to carry on their long distance telephone business.  
          Thus, when a customer dialed a number in another LATA, the customer’s LEC
would first transmit the signal to an IXC’s Point of Presence (POP). In a typical interLATA
long distance call, the originating caller’s LEC transports the signal from the caller’s
telephone over the local loop


 to the LEC’s central office where the call is switched and
transported by a trunk line to the IXC’s POP. This occurs nearly instantaneously. 
Typically, the LEC has switched the caller to their IXC before the caller has completed
dialing the long distance number. Once the signal reaches the IXC’s long distance switch,
the IXC then switches the signal to its trunk facilities for transmission out-of-state to the
local switch of a second LEC serving the receiving party. The second LEC switches the
signal to its local loop and ultimately the call is received. The second LEC then reverses
the process and a circuit is established over which the two parties can communicate.
          III.      Access and Operator Charges
          An IXC’s cost of replicating Bell’s local network and facilities to provide long distance
service from the LEC’s premises was prohibitive. Thus, IXCs needed access to Bell’s
network in order to sell long distance services to their customers, and the IXC’s customers
needed access to the LEC’s network to complete long distance services purchased from
IXCs. To recompense Bell for costs associated with maintaining its facilities and
equipment utilized by IXCs and the IXCs’ customers, the Federal Communications
Commission


 adopted uniform access charge rules. The FCC’s rules required LECs to
record their revenues in accordance with specified accounting rules and deposit accounts,
determine what fraction of the LEC’s regulated expenses and investments in its facilities
or network should be allocated to providing interstate access, and set charges or tariffs



Bell could charge its customers and IXCs. See Access Charge Reform, CC Docket No.
96-262, First Report and Order, 12 FCC Red 15982, 15998-99 (1997) (Access Charge
Reform Order), aff’d, Southwestern Bell Telephone Co. v. F.C.C., 153 F.3d 523 (8th Cir.
1998).
           At issue, here, are Bell’s revenues deposited in two FCC denominated deposit
accounts for Network Access Revenues


 and a customer account for various pay-per-use
services as follows: 
 

          A.       End User Common Line Charges
          The End User Common Line Charge (EUCL) is a flat rate charge designed to
recover a portion of Bell’s cost of providing the local loop to transport customers’ long
distance calls to IXC POPs. Bell’s EUCL revenues are recorded in its 5081 Account.


 
See 47 C.F.R. § 32.5081 (2001). The EUCL charge is paid by local subscribers whether
any long distance call is actually made or received. 
          B.       Special Access Charges 
          Bell also charges a fixed monthly fee for access to dedicated telephone lines or
circuits installed by Bell within the local exchange network that are used to transport long
distance calls directly from customers to their IXC POP. Dedicated lines transport a
customer’s long distance call directly through Bell’s central office to the IXC’s POP without
being switched. Bell’s revenues from customer access to dedicated lines is accounted for
in Account 5083.


 See 47 C.F.R. § 32.5082 (2001). 
          C.       Operator Assistance Charges
          Although Bell is prohibited from offering long distance telephone service, Bell is
permitted to offer directory and operator assistance to customers making long distance
calls. For instance, these charges occur when a customer located in Texas using a Texas
phone facility while placing an interstate intraLATA call dials a Bell operator for directory
assistance or assistance to complete the long distance call. The charges are pay-per-use
charges. These revenues are deposited in Account 5160.1.


 47 C.F.R. § 32.5160 (1995).
           IV.      Texas’s Franchise Tax and Current Controversy
          Texas’s franchise tax is imposed upon all domestic and foreign corporations doing
business in Texas. § 171.001. The granting of the privilege to transact business in Texas
confers economic benefits, including the opportunity to realize gross income and the right
to invoke the protection of local law. Bullock v. National Bancshares Corp., 584 S.W.2d
268, 270 (Tex. 1979), cert. denied, 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980). 
The Texas franchise tax is a tax on the value of this privilege. Id. 
          During calender years 1995-2001, Bell was an LEC in a number of states including
Texas. Because Bell conducted business inside and outside of Texas, its franchise tax
was calculated by an apportionment formula. Its company-wide taxable capital (net worth)
and taxable earned surplus (net income) were apportioned between Bell’s business done
in Texas and business done elsewhere to obtain a correct assessment of Texas franchise
taxes. This calculation and the resulting effect of having a larger proportion of gross
receipts from business done in Texas may be stated as follows:
Simply described, “net taxable earned surplus” is determined by (1) adjusting
the amount of a corporate taxpayer’s federal taxable income to yield “taxable
earned surplus,” (2) “apportioning” or attributing the taxable earned surplus
to Texas; and (3) subtracting various allowable deductions from the
apportioned taxable earned surplus. Tex. Tax Code Ann. § 171.110(a)
(West Supp. 2004). . . .
 
Under tax code sections 171.106 and 171.110(2), taxable earned surplus is
to be “apportioned” to Texas by multiplying it by a fraction, the numerator of
which is the corporation’s “gross receipts from business done in this state,”
as determined under section 171.1032, tax code, and the denominator of
which is the corporation’s “gross receipts from its entire business,” as
determined under section 171.1051. Id. at §§ 171.106(b), 171.110(a)(2).
[footnote omitted]. Thus, the larger the corporation’s “gross receipts from
business done in this state,” the larger the apportionment factor, and the
larger percentage of its taxable earned surplus is subject to the franchise tax.
 
Anderson-Clayton Bros. Funeral Home, Inc. v. Strayhorn, 149 S.W.3d 166, 169
(Tex.App.–Austin 2004, pet. denied).
          As in Anderson-Clayton, the center of the present dispute is the apportionment of
Bell’s receipts as either Texas or non-Texas receipts. If Bell shows that more of its receipts
in any tax year were not “gross receipts for business done in Texas” or were subject to an
exemption from apportionment as Texas receipts, then the lesser the apportionment factor
and consequently the lesser percentage of its taxable earned surplus is subject to the
Texas franchise tax, i.e., Bell owes less state franchise taxes. Conversely, if the opposite
is true, then the larger the apportionment factor and the greater its taxable earned surplus
subject to the Texas franchise tax. Doing more business in Texas generally results in
higher franchise taxes. 
          The earned surplus apportionment statute in existence between 1995-2001 provided
that Texas receipts are from “business done in Texas” as follows:
171.1032. Determination of Gross Receipts From Business Done in this
State for Taxable Earned Surplus

 
(a) Except for the gross receipts of a corporation that are subject to the
provisions of Section 171.1061, in apportioning taxable earned surplus, the
gross receipts of a corporation from its business done in this state is the sum
of the corporation’s receipts from:

 
(1) each sale of tangible personal property if the property is delivered or
shipped to a buyer in this state regardless of the FOB point or another
condition of the sale, and each sale of tangible personal property shipped
from this state to a purchaser in another state in which the seller is not
subject to any tax on, or measured by, net income, without regard to whether
the tax is imposed;

 
(2) each service performed in this state;

 
(3) each rental of property situated in this state;

 
(4) each royalty for the use of a patent or copyright in this state; and

 
(5) other business done in this state.





Section 171.1032.



 
          In addition to this “gross receipts” statute, the Comptroller had adopted rules that
exempted certain telephone company receipts from apportionment as Texas receipts for
franchise tax purposes. The Comptroller established the following exemption when
apportioning the taxable capital (net worth) component of the franchise tax for telephone
companies as follows:
Telephone company receipts. All receipts for calls of a telephone company
in Texas are Texas receipts, except for receipts from interstate calls.
 
34 Tex. Admin. Code § 3.549(e)(43) (2008) (emphasis added).
 
          The Comptroller also established the following exemption when apportioning the
earned surplus (net income) component of the franchise tax for telephone companies as
follows:
Telephone companies. All revenues for telephone calls in Texas are Texas
receipts except for revenues from calls in interstate commerce.
 
34 Tex. Admin. Code § 3.557(e)(39), as adopted, 17 Tex. Reg. 7667 (1991) (effective date:
November 13, 1992). (emphasis added).


 These Rules required that “[s]ervice receipts
[be] apportioned to the location where the service is performed.” 34 Tex. Admin. Code §§
3.549(e)(38) (2008); 34 Tex. Admin. Code § 3.557 (1992).
Discussion
          Bell contends that its access and operator assistance charges are not subject to
apportionment as “gross receipts from business done in [Texas]” because these activities
do not constitute “service[s] performed in this state. See § 171.1032. Bell also contends
these charges are exempt from apportionment as Texas receipts because they constitute
“receipts from interstate calls” or “revenues from calls in interstate commerce.” See 34
Tex. Admin. Code § 3.549(e)(43); § 3.557(e)(39). Bell next asserts that apportioning its
access and operator assistance charges as Texas receipts violates equal protection
guarantees because Bell does not receive preferential tax treatment received by IXCs and
transportation companies under the Comptroller’s Rules. Finally, Bell contends that the
trial court improperly excluded some of its summary judgment evidence. 
          I.        Standard of Review
          When, as here, parties file cross-motions for summary judgment, each party in
support of its motion necessarily takes the position that there is no genuine issue of fact
in the case and that it is entitled to judgment as a matter of law. City of Pflugerville v.
Capital Metropolitan Transp. Authority, 123 S.W.3d 106, 109 (Tex.App.–Austin 2003, pet.
denied). When both parties move for summary judgment on the same issues and the trial
court grants one motion and denies the other, the reviewing court considers the summary
judgment evidence presented by both sides, and determines all questions presented. 
Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). See Commissioners
Court of Titus County v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). When the trial court’s
order granting summary judgment does not specify the basis for the ruling, we must affirm
summary judgment if any of the summary judgment grounds are meritorious. Western
Investments, Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005). 
          Here, the parties rely on statutory provisions and administrative rules to support their
entitlement to summary judgment. In general, matters of statutory construction are
questions of law rather than issues of fact. City of Garland v. Dallas Morning News, 22
S.W.3d 351, 357 (Tex. 2000); Berry v. State Farm Mut. Auto Ins. Co., 9 S.W.3d 884, 890
(Tex.App.–Austin 2000, no pet.). Accordingly, we review the trial court’s decision to grant
summary judgment de novo. Valence Operating Company, 164 S.W.3d at 661.
          II.       Gross Receipts From Business Done In Texas
          Whether Bell’s access and operator assistance charges are subject to
apportionment as “gross receipts from business done in Texas” depends, in part, on
whether they constitute “service[s] performed in this state.” See §§ 171.103, 171.1032. 
Accordingly, we must determine whether the term “service” includes providing a customer
access to a communications network for the purpose of completing long distance calls
and/or operator assistance. 
 

A.       Statutory Interpretation 
          We interpret statutory provisions and administrative rules under traditional principles
of statutory construction. Rodriquez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 254 (Tex.
1999); Gulf Coast Coalition of Cities v. Public Utility Com’n, 161 S.W.3d 706, 712
(Tex.App.–Austin 2005, no pet.). Our primary objective is to ascertain and give effect to
the Legislature’s intent. Tex. Gov’t Code Ann. §§ 312.005 (Vernon 2005). See Texas
Dept. of Protective and Regulatory Services v. Mega Child Care, 145 S.W.3d 170, 176
(Tex. 2004).
          To discern the Legislature’s intent, we begin with the plain and common meaning
of the statute’s words. Tex. Gov’t Code Ann. § 312.003 (Vernon 2005). See Texas Dept.
of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex. 2004). If a statute uses a
term with a particular meaning or assigns a particular meaning to a term, we are bound by
the statutory usage. Texas Dep’t of Transportation v. Needham, 82 S.W.3d 314, 318 (Tex.
2002). If a statute is unambiguous, we must adopt the interpretation supported by its plain
language unless such an interpretation would lead to absurd results. Mega Child Care,
145 S.W.3d at 177. We must also consider the statute as a whole rather than its isolated
provisions. City of Sunset Valley, 146 S.W.3d at 643; City of Canyon v. Fehr, 121 S.W.3d
899, 905 (Tex.App.–Amarillo 2003, no pet.). 
           If there is vagueness, ambiguity, or room for policy determinations in a statute or
regulation, we normally defer to the agency’s interpretation unless it is plainly erroneous
or inconsistent with the language of the statute, regulation, or rule. Gulf Coast Coalition
of Cities v. Public Utility Com’n, 161 S.W.3d 706, 712 (Tex.App.–Austin 2005, no pet.). 
If a statute can be reasonably read as the agency has ruled, and that reading is in harmony
with the rest of the statute, then we are bound to accept the agency’s interpretation even
if other reasonable interpretations exist. Berry, 9 S.W.3d at 893. Moreover, revenue
measures are liberally construed to effectuate their purpose which is to secure the payment
of the taxes levied therein. Isbell v. Gulf Union Oil Co., 147 Tex. 6, 209 S.W.2d 762, 764
(1948); Steakley v. West Tex. Gulf Pipe Line Co., 336 S.W.2d 925, 928
(Tex.Civ.App.–Austin 1960, no writ). 
          B.       Service
          The Franchise Tax statutes neither explain nor define the ambiguous phrase,
“business done in Texas”; see Humble Oil & Refining Co. v. Calvert, 414 S.W.2d 172, 180
(Tex. 1967), or the term “service.” However, regarding telephone companies, the
Comptroller has interpreted the phrase “business within this state” to include “fixed periodic
access and equipment charges for equipment located in Texas whether used for intrastate
or interstate communications”; Comptroller Rule 3.56 (1983) (emphasis added),


 and has
consistently interpreted access charges for the use of local telephone networks and
facilities to be charges for rendering a “service.” See Comptroller Letter Ruling (1989)
(access charges are for intrastate service--for access to the local network);


 Comptroller
Letter Ruling (1992) (payments made in return “for access to local networks or for the use
of local facilities are considered Texas receipts);


 Comptroller Letter Ruling (1998)
(providing facilities for access to complete long distance calls is a service).


 In fact, as
early as 1952, the Attorney General referred to “receipts from loop services and from
charges received . . . for the use of [telephone] lines, equipment or facilities in Texas” as
“services.” Op. Tex. Att’y Gen. No. V-1383, 7 (1952).


 Similarly, the FCC classifies
exchange access as a “service.”



            Interpretations of the term “service” by the Comptroller comport with its common
meaning; Merriam-Webster’s Collegiate Dictionary 1137 (11th Ed. 2003) (“disposal for
use”),


 and the definition adopted by the Texas Legislature regarding access activities
conducted by public utilities such as Bell.


 See Tex. Util. Code Ann. § 51.002(5) (Vernon
2007)(“‘Local exchange telephone service’ means . . . connections between a customer
premises and a long distance provider serving the exchange.”)


 Moreover, the record
reflects that Bell’s corporate representative and director of access regulatory


 testified on
deposition that “[a]ccess is the provision of service generally to carriers for transmission
of voice and data within a LATA.” (emphasis added). He also agreed in deposition that
all gross receipts at issue in the underlying lawsuit were revenues Bell received as a result
of having regulated rates and providing tariff services. 
          Interpreting the term “service” to include operator assistance also comports with its
common meaning; Merriam-Webster’s Collegiate Dictionary at 1137 (to help, use, benefit,
contribution to the welfare of others), as well as the definition supplied by the Texas
Legislature in the area of public utility regulation related to telephone companies. See Tex.
Util. Code Ann. § 55.081 (Vernon 2007).


 
          Accordingly, we find that the term “service” includes providing access to a
communications network for the purpose of completing long distance calls and/or operator
assistance. This definition comports with the Comptroller and Attorney General’s
interpretations, the term’s common meaning and its technical meaning, if any exists, in the
telephone industry.
          The Comptroller’s Franchise Tax Rules provide that “[s]ervice receipts are
apportioned to the location where the service is performed.” 34 Tex. Admin. Code §
3.557(e)(33) (2008). “Where ‘the act is done’ determines the geographical character of
receipts derived from the performance of a service.” Tex. Comp. Pub. Acc’ts Hearing No.
10,028, 180 WL 5466 at *5 (Nov. 27, 1980)(quoting Humble Oil, 414 S.W.2d at 180. And
“receipts from the sale of services must be apportioned to the location of the services.” 
Westcott Communications, Inc. v. Strayhorn, 104 S.W.3d 141, 146 (Tex.App.–Austin 2003,
pet. denied). 
          The record establishes that the access and operator assistance services underlying
this appeal were requested by Bell’s customers located in Texas who were then serviced
by Bell’s network, facilities, and/or personnel also located in Texas. As such, these
“transactions begin and end in Texas.” See Bullock v. Enserch, 614 S.W.2d 215, 217
(Tex.Civ.App.–Austin 1981, writ ref’d n.r.e.), cert. denied, 455 U.S. 946, 102 S.Ct. 1445,
71 L.Ed.2d 659 (1982). Accordingly, we find as reasonable the Comptroller’s interpretation
that these revenues are from “services performed in this State,” and represent “gross
receipts from business done in Texas.” Nevertheless, this determination does not end our
analysis. We must next determine whether the Comptroller’s Rules exempt Bell’s access
and operator assistance charges from apportionment as “gross receipts from business
done in Texas.” We find that they do not. 
          III.      Franchise Tax – Apportionment Exemption
          Although Bell’s access and operator charges are subject to apportionment as “gross
receipts from business done in Texas,” they may be exempt from such apportionment if
they are receipts from “interstate calls” or “revenues from calls in interstate commerce.” 
See 34 Tex. Admin. Code § 3.549 (43) (2008); 34 Tex. Admin. Code § 3.557 (39) (1992). 
Accordingly, we must next determine whether Bell’s access service and operator charges
represent “receipts from interstate calls” or “revenues from calls in interstate commerce.”
           A.       Administrative Rule Interpretation
          It is a long-standing rule that exemptions from taxation are subject to strict
construction because they place a greater burden on other tax-paying businesses and
individuals rather than placing the burden on all taxpayers equally. Cordillera Ranch, Ltd.
v. Kendall County Appraisal Dist., 136 S.W.3d 249, 253-54 (Tex.App.–San Antonio 2004,
no pet.) (citing North Alamo Water Supply Corp. v. Willacy County Appraisal Dist., 804
S.W.2d 894, 899 (Tex. 1991)). As such, tax exemptions are “the antithesis of equality and
uniformity,” Hilltop Village, Inc. v. Kerrville Independent School Dist., 426 S.W.2d 943, 948
(Tex. 1968), and cannot be raised by implication. Bullock v. National Bancshares Corp.,
584 S.W.2d 268, 272 (Tex. 1979), cert. denied 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d
645 (1980). Exemptions must affirmatively appear and all doubts are resolved in favor of
the taxing authority and against the claimant. Id. 
          The burden of proof is on the person claiming the exemption to clearly show that it
comes within the statutory exemption; id; USA Waste Services of Houston, Inc. v.
Strayhorn, 150 S.W.3d 491, 495 (Tex.App.–Austin 2004, no pet.), and, although we are
not bound by the Comptroller’s interpretation, the Comptroller’s administrative
interpretation of ambiguous language in a revenue statute is entitled to our respect and
due weight. Rylander v. Fisher Controls Int’l, 45 S.W.3d 291, 299 (Tex.App.–Austin 2001,
no pet.); Quorum Sales, Inc. v. Sharp, 910 S.W.2d 59, 64 (Tex.App.–Austin 1995, writ
denied). Furthermore, an agency’s interpretation of its rule essentially becomes a part of
the rule itself because the agency’s interpretation represents the view of the regulatory
body that drafted and administers the rule. BFI Waste Systems of North America, Inc. v.
Martinez Environmental Group, 93 S.W.3d 570, 575-76 (Tex.App.–Austin 2002, pet.
denied); H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 604
(Tex.App.–Austin 2000, pet. denied).
          B.       Access Service Charges


 
          Bell asserts that its revenue from access charges is exempted because the charges
are for “interstate call[s]” or “call[s] in interstate commerce.” Bell contends that its
interpretation is consistent with analogous Texas pipeline cases interpreting the phrase
“business done in Texas” and federal common law interpreting the Commerce Clause, i.e.,
what constitutes interstate commerce. Bell also asserts that providing access for an
interstate, long distance call is inseparable from the call itself because the call is technically
an uninterrupted transmission across state lines and Bell’s local loop is necessary to the
origination and termination of such calls. Accordingly, the validity of Bell’s assertion hinges
upon whether its access service revenue is revenue from interstate calls or commerce.



           1.       1933-1952 – Early Attorney General Opinions 
          Our analysis begins with two Attorney General Opinions both of which address the
issue before us prior to the adoption of the Comptroller’s Rule exempting interstate calls
in 1975. In January 1940, the Attorney General was asked for a determination whether the
gross receipts of domestic telephone companies from interstate calls were subject to the
Texas gross receipts tax. Op. Tex. Att’y Gen. No. O-1878, 1 (1940). The domestic
companies operated wholly within Texas and provided long distance service to their
customers. They transmitted interstate long distance calls over their lines to the Texas
border where their calls were picked up by another company who transmitted the calls to
an out-of-state recipient. The domestic company was paid for the use of their lines within
Texas, and the out-of-state company was paid a commission for completing the call
outside Texas. Id. at 2. In determining that the charges were “interstate” in nature and not
subject to state tax, the Attorney General stated:
Under the facts here, the “gross receipts” sought to be taxed, were derived
not from tolls on calls originating and ending within the confines of the State
of Texas, but rather from tolls on calls originating in Texas and terminating
in other states, or vice versa, – in other words, in interstate commerce. The
fact that the telephone company in question receives only such part of the
tolls as represents payment for the facilities and services furnished by it in
transmitting the call from or to the borders of the State does not prevent such
receipts from being stamped with the interstate commerce feature. 
 
Id. at 4.
 
          In January 1952, the Attorney General was asked for a determination whether the
gross receipts of a domestic telephone company from calls that were routed from points
in Texas through New Mexico and back to Texas were subject to the Texas gross receipts
tax. Op. Tex. Att’y Gen. No. V-1383, 1 (1952). The Attorney General determined that the
calls routed through New Mexico had to be “treated as transactions constituting interstate
commerce”; id. at 5, and opined that the gross receipts tax was inapplicable because the
tax was not apportioned between the interstate and intrastate segments of the call. Id. at
6-7. The 1952 Opinion also indicated that, if there was apportionment, access services
could be subject to a state tax as follows: 
Although the gross receipts derived from the interstate business are not
subject to this tax, that portion of the receipts representing wholly intrastate
business which can be separated or segregated from the gross receipts is
subject to the tax. 51 Am. Jur. 777, 779, 804, Taxation, Secs. 872, 874, 907,
908. Therefore, the receipts from “loop services” and from charges received
under contracts or agreements for the use of lines, equipment or facilities in
Texas are subject to the tax even though such services may be incidental to
an interstate communication. [citation omitted].
 
See id. (Emphasis added).


 
 
          The defining difference between the two Opinions is that, in the 1940 Opinion, the
Attorney General is describing a service contract that requires transmission between two
states for its completion, and in the 1952 Opinion, the Attorney General is describing a
service contract that is fully performed within Texas. In the 1940 Opinion, the domestic
telephone companies offered interstate long distance service to their customers and
transmitted calls across state lines to complete the long distance service. Op. Tex. Att’y
Gen. No. O-1878, 1 (1940). Because completion of the service owed by the domestic
telephone company was interstate in nature, its revenues were considered derived from
interstate commerce. Id. at 4. 
          In the 1952 Opinion, the Attorney General recognized that, although the domestic
telephone company’s calls were interstate transactions, a portion of its receipts would be
taxable as Texas receipts if the state’s tax apportioned the company’s “receipts from ‘loop
services’ and from charges received under contracts or agreements for the use of lines,
equipment or facilities in Texas.” Op. Tex. Att’y Gen. No. V-1383, 6-7 (1952). In the 1952
Opinion, the Attorney General did not describe a contract for a service to be delivered in
another state but a contract for the use of facilities and/or equipment located in Texas.
          2.       1972-2000 – Comptroller’s Rules and Policies 
          In 1972, the Comptroller adopted an adjudicatory rule that “revenues from interstate
toll charges are not ‘business done in Texas.’” See Comptroller Hearing No. 5587 (1972).


 
In Hearing No. 5587, four telephone companies sought a refund of franchise tax payments
determined by apportioning charges from their long distance telephone service as Texas
receipts. All the telephone companies provided both local and long distance service to
their customers. After considering the 1940 and 1952 Opinions and relevant case law, the
Comptroller held that “[r]evenues from interstate toll charges are not ‘business done in
Texas.’” In 1975, the Comptroller adopted a Franchise Tax Rule identical in its import to
the Rule applicable here, i.e., “[r]eceipts of a telephone company in Texas from interstate
calls are not Texas receipts.” Comptroller Rule 3.51 (1976).


 Accord Comptroller Rule
3.403(c)(2) (1979).


 
          In 1983, the Comptroller adopted a Franchise Tax Rule similar to the 1952 Opinion
as follows: “[b]usiness within this state also includes fixed periodic access and equipment
charges for equipment located in Texas whether used for intrastate or interstate
communications.” See Comptroller Rule 3.56 (1983).


 And, in conformity therewith, the
Comptroller responded to a request by Bell for clarification in 1989 with a Letter Ruling
stating: “access charges [are] for intrastate service, for access to the local network by the
long distance carrier. These are not charges for interstate service provided by
Southwestern Bell.” Comptroller Letter Ruling (1989).



          In three successive Letter Rulings, the Comptroller adhered to its policy that access
service charges for use of a telephone company’s local network and facilities were Texas
receipts. Comptroller Letter Ruling (1998); Comptroller Letter Ruling (1994); Comproller
Letter Ruling (1992).


 Thus, since the adoption of Franchise Tax Rule 3.56 in 1983, the
Comptroller consistently treated access charges as intrastate services—Texas receipts.
          However, in 2000, the Comptroller differentiated between the apportionment of
access charges paid by IXCs and EUCLs for franchise tax purposes finding that access
charges paid to LECs by IXCs were non-Texas receipts while access charges paid to LECs
by end users, EUCLs, remained Texas receipts. See Tex. Comp. Pub. Acct’s. Hearing No.
35,677 (2000).


 In an earlier unrelated proceeding, Hearing No. 35,677, the Comptroller
determined that, under a literal translation of Rule 3.557(e)(39), access charges paid by
IXCs to LECs were “revenue from an interstate telephone call” because IXCs incurred an
access charge when an actual interstate telephone call was made, i.e., the access charge
was based on the interstate minutes of use of the LEC’s network by the IXC. *19-20. On
the other hand, the Comptroller determined EUCLs paid by end users to LECs were not
“revenue from an interstate telephone call” because LECs billed EUCLs even if no
interstate telephone call was made by or to the customer, i.e., the EUCL was a fixed
charge to all telephone customers to compensate LECs for use of the network to be able
to place and receive interstate telephone calls. *19-20.



          Thus, in 1972, the Comptroller initially recognized the policy that revenues from
interstate long distance calls were not “business done in Texas,” and, in 1975, adopted a
conforming franchise tax Rule, i.e., receipts “from interstate calls are not Texas receipts.” 
Since 1983, the Comptroller consistently recognized through Rule, Letter Rulings, and
adjudication that EUCLs were not “revenue from an interstate telephone call” but
apportionable under the franchise tax statutes as Texas receipts.


 
          3.       Interstate Commerce – Analogous Texas and Federal Cases
          Analogous case law also supports the proposition originally stated in the 1952
Opinion that underlies the Comptroller’s subsequent Rules, Letter Rulings, and
Adjudicatory Ruling related to EUCLs. That is, where a service contract is for the use of
telephone facilities located in Texas, performance of the contract is intrastate. 
          For instance, in Clark v. Atlantic Pipe Line Co., 134 S.W.2d 322
(Tex.Civ.App.–Austin 1939, writ ref’d), oil shippers contracted directly with Atlantic Pipe
Line (“Atlantic”) to ship oil from locations in Texas and other states to Texas Gulf ports
where the oil was to be loaded onto ocean-going vessels and shipped to other states or
foreign countries. Id. at 324-25. Although recognizing that the phrase “business done in
Texas” was “broad enough to include that segregated portion of interstate business which
is wholly performed within the State,” the court held that Texas could not tax Atlantic’s
proceeds from shipping oil in, or through, Texas because the oil’s shipment would not be
completed until it reached another state or foreign country. Id. at 328. The court held as
follows:
We hold that the language, “business done in Texas,” as employed in this
statute was intended to mean business begun and completed in Texas, and
not business begun in Texas and completed in some other state or foreign
nation, or vice versa. In other words, that it means intrastate business.
 
Id. 
 
          Thus, Atlantic engaged in “interstate business” by contracting directly with oil
shippers to ship their oil through its pipeline located in Texas to an ocean vessel destined
for delivery in another state or foreign country. Atlantic’s “business” was not providing the
oil shippers with access to, or leasing, its pipeline in order for the oil shippers to ship the
oil themselves. In the first instance, Atlantic is engaged in interstate commerce because
the “business” of shipping the oil is not complete until the oil is delivered in another state
or country. In the second instance, Atlantic would be engaged in intrastate commerce
because the “business” of providing access to, or leasing, facilities in Texas begins and
ends with the facilities in Texas. 
          Bullock v. Enserch Exploration, Inc., 614 S.W.2d 215 (Tex.Civ.App.–Austin 1981,
writ ref’d n.r.e.), cert. denied, 455 U.S. 946, 102 S.Ct. 1445, 71 L.Ed.2d 659 (1982), is also
instructive. In Bullock, the “critical issue [was] whether [Enserch’s] sale of natural gas with
deliveries [by pipeline] in Texas to interstate companies for resale outside of Texas
constituted “business done in Texas.” Id. at 216. The court held that the sale of gas by
a Texas gas company to an interstate pipeline company for resale outside of Texas
represented “gross receipts from its business in Texas.” 614 S.W.2d at 217. Enserch had
neither a contract for the sale of gas to an out-of-state purchaser nor a contract to ship gas
produced in Texas out of state. There simply was no interstate component to Enserch’s
business – Texas gas was shipped and sold in Texas.
           United States Supreme Court opinions determining what business constitutes
“interstate commerce” are also instructive. See Atlantic Pipe Line Co., 134 S.W.2d at 327. 
For instance, in People of State of New York ex rel. Pennsylvania R.R. Co. v. Knight, 192
U.S. 21, 24 S.Ct. 202, 48 L.Ed. 325 (1904), a company operating a ferry located in New
York established a cab stand at the ferry station whose sole business was to bring the
company’s passengers to and from the ferry. 192 U.S. at 22 . Charges for the taxi service
were separate from the company’s charges for further transportation by ferry across state
lines, and no part of the receipts from the cab service were received as compensation for
any service outside the State of New York. Id. The Knight court held that the cab service
was “an independent local service, preliminary or subsequent to any interstate
transportation” constituting intrastate commerce. Id. at 26-28. The Knight court reasoned
as follows:
As we have seen, the cab service is rendered wholly within the state, and
has no contractual or necessary relation to interstate transportation. It is
either preliminary or subsequent thereto. It is independently contracted for,
and not necessarily connected therewith. But when service is wholly within
a state, it is presumably subject to state control. The burden is on him who
asserts that, though actually within, it is legally outside, the state; and unless
the interstate character is established, locality determines the questions of
jurisdiction.
 
Id. at 27.
 
          Here, like Knight, Bell’s access services are independently contracted for and wholly
performed in Texas. Moreover, because Bell was required to provide network access to
all its customers seeking local or long distance service, it was legally prohibited at the time
from engaging in any long distance service or competing with any long distance carrier and
charged its customers EUCLs whether they made or received any long distance calls, its
service did not bear any necessary relation or connection to the provision of any interstate
long distance telephone service. Bell’s network facilities were mere instrumentalities of
commerce whereby Bell exacted a fee for its customers’ use of its lines and switches
located in Texas to complete their long distance telephone business with an IXC. As such,
Bell’s service is intrastate; see Detroit International Bridge Co. v. Corporation Tax Appeal
Board of Michigan, 294 U.S. 83, 85, 55 S.Ct. 332, 79 L.Ed. 777 (1935) (toll bridge is an
“instrumentality which others may use in conducting foreign commerce”); Henderson
Bridge Co. v. Kentucky, 166 U.S. 150, 153-54, 17 S.Ct. 532, 41 L.Ed. 953 (1897),


 i.e.,
Bell’s local service customers and IXCs merely paid Bell for the privilege of using its Texas
facilities so that they, in turn, could engage in interstate commerce. Id.


 Accordingly, we
find as reasonable the Comptroller’s ad hoc rule recognized in the 2000 Hearing and
applied here. 
          In addition, where, as here, the Comptroller has adopted an ad hoc rule that has a
retroactive effect, Grocers Supply Company, Inc. v. Sharp, 978 S.W.2d 638, 643-44
(Tex.App.–Austin 1998, pet. denied), “the reviewing court must also determine whether
application of the new policy to a party who relied on the old is so unfair as to be arbitrary
and capricious.” Microcomputer Technology Institute v. Riley, 139 F.3d 1044, 1050 (5th Cir.
1998) (citing 1 K. Davis & R. Pierce, Jr., Administrative Law Treatise § 3.5 at 120 (1994)). 
Because the Comptroller’s ad hoc rule is consistent with the Attorney General’s
longstanding interpretation rendered in the 1952 Opinion, agency policy interpretations
since 1983 and applicable state and federal caselaw, we find the retroactive application
of the ad hoc rule regarding LECs non-exempt status for access charges is not “so unfair
as to be arbitrary and capricious.” 
          Bell contends the access charges are “revenues from interstate calls” because an
interstate long distance call cannot originate or terminate without access to Bell’s local loop
and long distance calls are by nature uninterrupted transmissions of an electronic signal. 
However, under these circumstances, whether a voice transmission may be uninterrupted
is a distinction without a difference. See Knight, 192 U.S. at 26-28; Bullock, 613 S.W.2d
at 216-17. When state taxation of activities or property within a state is at issue, “[i]t is no
longer a question of actual interruption of the operation of commerce,” and the fact that the
interstate activities could not be conducted without the local activities is not conclusive. 
Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 95-96, 68 S.Ct. 1475, 92 L.Ed.2d 1832
(1948). “Rather, a prohibited tax exaction is one beyond the power of the state because
the taxable event is outside its boundaries or for a privilege the state cannot grant.” Id. 
Here, the privilege to conduct business in Texas is a privilege Texas can grant and the
taxable event is confined to Texas – payment of a service charge to Bell by a Texas
customer for the use of, or access to, Bell’s facilities located in Texas. 
           Moreover, the FCC’s interpretation of the nature of the “interconnection” provided
by Bell when granting access to its network also supports this result. As discussed earlier,
during the relevant time period, Bell was required to provide local telephone service and/or
offer local access for long-distance service. See 47 U.S.C. § 153 (2001). This duty
included providing for an “interconnection” between Bell’s network and the “facilities and
equipment” of IXCs. See id. at § 15. The FCC has interpreted the term “interconnection”
to be the “physical linking of two networks for the mutual exchange of traffic.” Competitive
Telecommunications Ass’n v. F.C.C., 117 F.3d 1068, 1071-72 (8th Cir. 1997). See
Southwestern Bell Telephone, L.P. v. Missouri Public Service Com’n, 530 F.3d 676, 684
(8th Cir. 2008). The FCC’s interpretation of the term “interconnection” does not include the
transmission or routing of telephone calls. Competitive Telecommunications Ass’n, 117
F.3d at 1071-72. Thus, Bell offers IXCs access to its telephone exchange service or
facilities “for the purpose of origination and termination of telephone toll service.” 47
U.S.C. § 153(a)(16) (2001) (emphasis added). Although the access service Bell offers to
its local customers may also include the transmission of their calls over its local network
to the IXC’s POP,


 for practical and business purposes, Bell’s transmission ceases when
its service is completed at the IXC’s POP where Bell “interconnects” with the IXC’s long
distance facilities. Thus, the EUCLs and special access charges are local charges for a
service that begins at the local customers’ premises and ends at the IXC’s POP in Texas,
i.e., begins and ends in Texas. 
          Although the parties acknowledge that an “interstate telephone call is a complete
end-to-end communication that crosses state lines,” Bell’s access service is not a part of
the interstate service provided by the IXC. In a business and practical sense, Bell leases
its network to its customer for the purpose of originating and terminating long distance
calls. Moreover, Bell supplies no more than an “interconnection” at the IXC’s POP and
does not transmit or share in the IXC’s transmission of the call across state lines. Bell’s
access service is completed when its local customer’s call reaches the IXC’s POP, and
again, when Bell’s lines pick up the return signal at the IXC’s POP and transports the signal
to the customer’s premises. As such, Bell’s role is prepatory and incidental to any
interstate commerce being conducted between the IXC and its customer. Although the
telecommunications industry is highly technical, we must not lose sight of the fact that
“taxation is a practical matter, and that what constitutes commerce, manufacture, or
production is to be determined upon practical considerations.” Utah Power & Light Co.,
286 U.S. at 178-79. 
          Bell also asserts the access charges are interstate rather than intrastate because
access charges are federally tariffed charges created under the auspices of the FCC. 
However, there is no federal mandate giving the FCC exclusive jurisdiction over the
regulation or taxation of telecommunications companies. Simply because the FCC
regulates telephone companies does not mean that the regulated activities are solely, or
necessarily, interstate. Congress may regulate purely intrastate telephone activity to
protect interstate commerce. See United States v. Lopez, 514 U.S. 549, 558, 115 S.Ct.
1624, 131 L.Ed.2d 626 (1995); United States v. Gilbert, 181 F.3d 152, 158 (1st Cir. 1999)
(discussing the “long standing” line of cases holding Congress may regulate purely
intrastate telephone activity under the Commerce Clause). Moreover, the Federal
Telecommunications Act of 1996 disclaims authority over state taxation. 110 Stat. 56, 144
(“nothing in this Act . . . shall be construed to modify, impair, or supersede . . . any State
or local law pertaining to taxation”). “Federal regulation does not preclude state taxation
and state taxation does not preclude federal regulation.” Polish Nat. Alliance of United
States v. N.L.R.B., 322 U.S. 643, 649, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944). Thus, we
decline to disturb the Comptroller’s determination that, while the FCC’s regulation and
classification of access charges is informative, it is not determinative. See Comp. Pub.
Acct’s Hearing No. 35,677, *20 (2000).



          C.       Operator Assistance Service Charges
          Bell also asserts that its revenues from operator assistance charges are revenues
from “interstate calls” or “calls in interstate commerce.” These services primarily involve
directory assistance, busy interrupt, and zero transfer operator assistance. As described
by Bell’s corporate representative on deposition, these “miscellaneous services [are]
associated with [a customer] trying to make or place an interstate call.” They are pay-per-use charges for the use of Bell’s facilities and personnel located in Texas. As such, these
service charges do not represent revenue from a “call,” either intrastate or interstate. 
          Bell urges this Court to adopt a rule whereby its access service and operator
assistance receipts would be excluded from apportionment as Texas receipts so long as
they enable customers to make “interstate calls” or “calls in interstate commerce.”


 Bell’s
proposed rule would require an amendment to the Comptroller’s Rule and eviscerate the
existing exemptions – “receipts that enable interstate calls” is a far more expansive
exemption than “receipts from interstate calls.” Bell has failed to meet its burden of proof
in establishing that these access and operator assistance charges are exempt from
apportionment as Texas receipts. 
          Accordingly, Bell’s first issue is overruled.
          IV.      Equal Protection
          Bell argues that apportioning its access and operator assistance charges as Texas
receipts for franchise tax purposes violates the Equal Protection Clause of the United
States Constitution. U.S. Const. amend. XIV.


 Bell asserts that, although it is similarly
situated, IXCs and transportation companies receive preferential treatment because their
receipts from intrastate “legs” of interstate telephone service and/or transportation are not
apportioned as Texas receipts.


 Bell also contends that LECs are similar to IXCs because
they both participate in the transmission of an interstate phone call utilizing like equipment
and facilities located in Texas.
          Although states generally have broad powers to impose and collect taxes,
classifications among taxpayers may not be arbitrary, unreasonable, or capricious. See
Hurt v. Cooper, 130 Tex. 433, 110 S.W.2d 896, 901 (1937); Upjohn Co. v. Rylander, 38
S.W.3d 600, 609 (Tex.App.–Austin 2000, pet. denied). Although all persons falling within
the same class must be taxed alike, a classification will not be found deficient unless it has
no rational basis. Upjohn, 38 S.W.3d at 609.
          Despite that LECs and IXCs may utilize similar equipment and facilities to transmit
telephone calls, Bell has failed to establish the lack of any rational basis for distinguishing
between LECs and IXCs for tax purposes. The business activities of LECs and IXCs are
dissimilar because each operates in separate and distinct areas. LECs charge local
customers and IXCs for access to, or use of, its intrastate facilities and equipment to
transmit the call from the customer’s premises to an IXC’s POP. Once the call reaches the
IXC’s POP, the IXC then utilizes its facilities and equipment to transmit its customer’s call
out of state. The customer contracts with the LEC for local service and access service to
complete long distance calls and independently contracts with an IXC for long distance
service. That Bell provides a different service than the IXC and Bell’s service is intrastate
rather than interstate establishes rational bases for distinguishing an LEC such as Bell from
IXCs for franchise tax classification purposes. See Westcott Communications, Inc., 104
S.W.3d 141, 150 (Tex.App.–Austin 2003, pet. denied). Moreover, an LEC cannot engage
in the service supplied by the IXC. Because Bell was permitted to maintain its monopoly
on “local” telephone service, it was legally prohibited from providing any interstate long
distance service to its local customers. 
          Regarding transportation companies, the differences are even more striking. Not
only do the two industries offer different services that neither can engage in on their own,
they do not utilize similar equipment or facilities. Moreover, that telephone services may
be analogous to transportation services in the abstract is an insufficient basis for
contending there is no rational basis for differing tax classifications. See Westcott, 104
S.W.3d at 150.



          To the extent Bell contends it is treated differently from IXCs because these services
are classified by the Comptroller as intrastate rather than interstate, we have already
addressed the issue. Accordingly, Bell has failed to establish that the Comptroller makes
an arbitrary and unreasonable distinction between these taxpayers and issue two is also
overruled. 
          V.       Summary Judgment Evidence
          Bell contends the trial court improperly excluded non-expert testimony in the
summary judgment proceedings below. While Bell notes the Comptroller objected to
“selected testimony” of two witnesses, Bell does not identify the specific testimony
improperly excluded by the trial court and states, “[t]he trial court improperly sustained
some of these objections.” Bell did not file a written response to the Comptroller’s
objections nor move for reconsideration of the trial court’s decision to sustain the
Comptroller’s objections to the affidavits of the two witnesses. 
          An appellant bears the burden of bringing forth a record that demonstrates the trial
court abused its discretion when it sustained an appellee’s objections to the summary
judgment evidence. Cantu v. Horany, 195 S.W.3d 867, 871 (Tex.App.–Dallas 2006, no
pet.) Where the record fails to show that a party objected to the trial court’s ruling
sustaining an opponent’s objection to his or her summary judgment evidence, the party has
not preserved the right to complain on appeal about the trial court’s ruling. Id. 
          Because Bell objects to “some” but not all of the possible grounds for the trial court’s
ruling that sustained the objection, Bell has waived the issue. See Malone v. Foster, 956
S.W.2d 573, 579 (Tex.App.–Dallas 1997), aff’d, 977 S.W.2d 562 (1998). Moreover, there
is nothing in the record to show that Bell filed a written response to the Comptroller’s
written Objections to Plaintiff’s Summary Judgment Evidence nor filed a motion for
reconsideration of the trial court’s order sustaining the Comptroller’s objections. Neither
were Bell’s issues preserved. Bell’s third issue is also overruled.
CONCLUSION
          Having overruled Southwestern Bell Telephone Company’s issues, the trial court’s
judgment is affirmed.


                                                                           Patrick A. Pirtle

                                                                                 Justice





Quinn, C.J., concurring.